## CHARLES T. WILCOX v. STATE.

No. A-9619.  Feb. 15, 1940.
(99 P. 2d 531.)

2

John W. Tillman and Fred A. Tillman, both of Pawhuska, for plaintiff in error.

Sim T. Carman, Co. Atty., of Pawhuska, Mac Q. Williamson, Atty. Gen., and Owen J. Watts, Asst. Atty. Gen., for defendant in error.

JONES, J. Charles T. Wilcox was charged in the district court of Osage county with the offense of murder; was tried, convicted and sentenced to serve a term of life imprisonment in the state penitentiary, and has appealed.

The record is voluminous, covering more than 700 pages.

The proof on behalf of the state was that about 4:30 a. m. on June 10, 1938, the fire department at Pawhuska was called to the home of Josephine Rogers in Pawhuska. Upon arriving at the home, the body of the deceased, Josephine Rogers, a woman about 75 years of age, was found lying in the doorway on a screened-in porch, the door being open. The defendant was there with the body. The body was badly burned and charred. There was a

fire in the southwest bedroom of the house, from which room a door led to the screened-in porch on the south. A gas fire in a stove in the northeast corner of the bedroom was burning. A mattress on a bed in the southwest corner of the room was afire. There was a fire on the floor about a foot or foot and a half from the bed. A smoking cord was hanging from the doorsill about three feet above the stove. The defendant Wilcox had on a pair of house slippers, trousers and an undershirt. They were not burned, but Wilcox's hands, neck and chest were burned. Two or three charred embers of some kind of cloth material were found near the stove. There were two chairs in the room, a wheel chair and a wicker chair. The nearest burn on the rug was about one and one-half feet from the bed. The north edge of the mattress was burned. The firemen sent for an ambulance for the deceased, which arrived in a few minutes; that there was no door between the room where the fire was and the north room where a bed was located, the head of which was about two feet from the stove; but there was an opening between the rooms; that bedspreads or blankets were hung over the windows in the room where the fire was, and that the lights were on in the room when they arrived. That based on the experience of the firemen, it would have taken the mattress from 40 minutes to an hour to be burned in the condition in which it was found and with the body lying on it, and that it would have taken 30 or 40 minutes lying on the mattress for the body to have been burned in the condition in which Mrs. Rogers was found. There was only a small piece of clothing left on the body of the deceased, her hair was burned off short, and there were no signs of life in her body.

A negro servant, Bill Williams, testified that he lived in the servant's quarters, north of the Rogers house;

that the defendant called him just before daylight to come and help him; that he went to the screened-in porch and saw the body of Mrs. Rogers lying there as it was found by the firemen; that Wilcox told him that the fire started from the heater; that he looked in the room, and that there was no fire on in the heater at that time; that before the firemen arrived Wilcox went in the house, but the witness did not see what he did.

A neighbor, Hazel Sponsler, together with other witnesses, testified that the deceased was partially paralyzed; that she could move both of her arms; that neither of them was entirely paralyzed; that she saw Mrs. Rogers the afternoon before she died the following morning, and that she could move her arms that afternoon, and demonstrated to the jury the manner in which she could use her arms.

Walter Johnson, the funeral director, answered the ambulance call to the Rogers home. The body was still lying in the doorway with the head just over the doorsill. She was dead. The body was burned considerably on the left side; the hair on her head had been burned short; but neither hand, on front or back, was burned; that the body on the left side showed that it had had long heat to have been burned so badly. The tip of the tongue was badly burned where it protruded through her teeth.

The defendant was taken to the county attorney's office for investigation, and he made a statement there to the officials that he had been staying at the deceased's home for several months; that on November 13, 1937, he and the deceased were secretly married at Deering, Kan.; that the marriage was kept secret because the deceased did not want her son, George Hood, a narcotic addict,

to learn of the marriage because he might kill them; that Wilcox stated that the first he realized anything was wrong was that he was awakened by an outcry or smoke; that he jumped up and started in the bedroom where the deceased was lying; that she said, "Charley, get me out of here; I am burning up." That Wilcox picked her up off the bed and started out of the room, and ran over the wheel chair and dropped the deceased; that he moved the chair, and picked her up and started to the door; that he was able to partially hold her up with one hand and open the door with the other; and that after getting her out on the porch, he had to let her completely down and open the door, as he had to use both hands to unlock the door; that after opening the door, he picked the deceased up and dragged her to the door where her head was protruding at the time the firemen arrived; that Mrs. Rogers had not smoked that evening, but that the fire started because some clothes which he had taken off of Mrs. Rogers and hung on the cord had caught fire from the stove which was turned too high; that only he and the deceased were in the house at the time of her death.

Witnesses were produced from Kansas who verified the fact of the marriage of the defendant to the deceased. The marriage license was obtained by the defendant on November 12, 1937, at Independence, Kan.; they were married the following night at Deering, Kan., in an automobile. The defendant explained to the minister who performed the marriage ceremony that Mrs. Rogers was an invalid and could not get out of the car.

The evidence showed that the deceased had been previously married and was the owner of one and one-third Osage Indian headrights; that she owned about 700 acres of land, the residence property at Pawhuska, and about 60 shares of stock in the American Telephone & Telegraph

Company; that she had only one child, a grown son by the name of George Hood.

The state introduced the evidence of five physicians who testified concerning the condition of the body of the deceased as disclosed by examination made by them.

Dr. Daly testified that he made X-rays of the neck of the deceased; that the X-ray pictures disclose that the deceased had a broken and dislocated neck which was sufficient to produce death; that there was an upward displacement toward the chin, and that the neck was twisted.

Dr. Hemphill and Dr. Walker testified that they saw the body of Mrs. Rogers at Johnson's Undertaking Parlor on June 10, 1938. The body was severely burned on the left side of the face and left side of the chest; the hands were not burned; the eyes were closed; the lids had second degree burns and blisters so that the skin had sloughed off the eyelids, but the eyes showed no irritation. The tip of the tongue where the tongue was sticking out from the teeth was burned black, the teeth were clamped down on the tongue, and there were no burns nor inflammation in the mouth. An autopsy was performed; they removed the larynx, the thyroid gland and brain. They opened the chest and examined the chest, abdomen, lungs, heart, and took these organs out for examination by a pathologist at Oklahoma City. There was a discolored area about three inches long and an inch wide on the right side of the neck, which had been caused prior to death by some hemorrhage into the skin; that this discolored area fit the fingers of a hand; that the thyroid cartilage, or what is called the Adam's apple, was fractured; that to fracture this Adam's apple it takes a bending motion; that rigor mortis had already set in

at the time of the examination; that they noticed the head was free and flopped around, and they had Dr. Daly take X-rays for that reason; that they had examined the X-ray pictures taken by Dr. Daly, which showed a dislocation of the third cervical vertebra; that from all of the conditions they found on the body, it was their opinion that death had occurred before the deceased had been burned. That from the condition of the body, it would have been impossible for her to have said at the time that she was removed from the fire, "Charley, get me out of here." That in their opinion the dislocation of the neck could not have been caused by the defendant permitting the deceased to fall after he had dragged her off the bed.

Dr. L. A. Turley testified about his examination of the vital organs of the deceased: That the blood vessels were all congested with blood in the central part of the brain, and there was blood tinted fluid in the lateral ventricle of the brain; that the condition that he found in the brain had been caused by an interference with the outflow of blood from the brain by shutting off the jugular vein; that it could not have been caused by a blow, but it could have been caused by choking; that this condition of the brain was before death, and in his opinion that it had occurred before the deceased was burned; that if a person had even a partial use of either of her hands, the hands would have had some burns on them because of the use of the hands in fighting the fire.

The proof on the part of the defendant was a denial that he had choked or struck or in any other way caused the death of the deceased, but that during all of the time he had stayed with the deceased he had given her unusual care and attention; that her physical condition was such that the defendant had to change her clothing several times every night; that their marriage had occurred at

8

the suggestion of the deceased; that her physical condition was such that she had no use of her hands or arms at the time of her death; that on the night of her death the defendant had been up with the deceased three times, the first time around 10:30, at which time he changed her clothes and hung the wet clothes over the stove, which was not lighted at that time. About 11:30 she called him again, and he changed her clothes again. About 2:30 she called him again, at which time she told him to light the fire. The bed in the east room was wet, so he wheeled her into the west room and changed her clothes. That they both smoked a few minutes, after which he laid her on the bed and went into his room and lay across the bed with his house slippers, undershirt, and pants on. The fire was burning in the stove. He was awakened about an hour after he went to bed. He thought she called him. He ran into her room; the bed was on fire, and the flames were all over her. That she said, "Charley, come and get me out." That he grabbed hold of her and jerked her away from the fire as quick as he could. He didn't know how he grabbed her; the bed was blazing, and her clothes were on fire. He stumbled and they both fell; that he raised her up and tried to make the door, but ran into a chair and dropped her. That some part of her hit the dresser. He finally got her out on the porch and laid her head outside the screened-in porch door, at which time he ran to the telephone and called the fire department; that he was engaged by Mrs. Rogers in October, 1934, to look after her business, and at that time he was making about a $100 a month selling cars and some $50 to $100 a month on marble machines; that she agreed to give him $100 per month for his work; that they quit keeping books after they married, and that she owed him about $3,200 at that time. He admitted giving the deceased a $500 mortgage on a Chrysler coupe on Decem-

ber 10, 1937, payable December 10, 1938, and that the note was payable to Josephine Rogers.

Several witnesses testified that the defendant had severe burns on various parts of his body when they saw him shortly after the fire.

Paul Comstock, an attorney at Pawhuska, testified that he was told of the marriage of the defendant with the deceased in December, 1937, when he drew up some papers for the defendant.

The defendant introduced medical testimony in which the doctors testified that in their opinion the fracture of the vertebra could have been caused by the defendant falling with the deceased in the manner which he described.

By agreement of both the counsel for the state and the defendant, the jury was permitted to go to the Rogers home and view the premises.

At the request of the defendant all of the furniture in the bedroom in which the fire occurred was brought into the courtroom and arranged in the courtroom as nearly like it appeared in the bedroom as could be done.

The defendant, for reversal of this case, makes several assignments of error which may be grouped under these headings:

(1) Misconduct of the jury.

(2) That the jury received evidence in the absence of the defendant.

(3) Error in the giving of instructions.

(4) Error of the court in his ruling upon the admissibility of evidence during the trial of said cause.

In support of assignments Nos. 1 and 2, the testimony of W. A. Burkhart, foreman of the jury, Abe Clifton, juror, and George Fisher, bailiff, was taken. This proof showed that while the jury were in the jury room, Burkhart's wife called him, and he was taken by the bailiff to a telephone; the other jurors were locked in the jury room. That Burkhart's wife wanted to tell him how her mother was; that no mention was made of the case in any way; that at no time did he hear or see any one attempting to communicate to the jury; that as foreman of the jury, Burkhart asked permission for the jury to be permitted to return to the courtroom and view the articles of furniture which were arranged in the courtroom and which had been admitted in evidence as exhibits in the trial of this case; that when the jurors were taken to the courtroom, the bailiff and sheriff unlocked the door and allowed them to go in; that the bailiff and sheriff remained outside of the door, and the door was closed while they were inside examining the exhibits; that they did not see or examine anything except that which they had been permitted to see and which had been admitted in evidence at the trial; that neither the judge nor the county attorney nor the defendant nor his lawyer nor any other person was present in the courtroom while they were making this examination; that the exhibits were in the same location as they had been placed by the witnesses in the courtroom. The evidence is not clear, but it appears that the telephone conversation occurred before the final submission of the case.

The bailiff testified to substantially the same state of facts as did Burkhart.

Abe Clifton was called by the defendant, admitted being called to the telephone, but denied talking over the telephone as the party had left, and denied having any

communication whatsoever with any person, and stated that he did not know of any juror receiving any information at any time other than what was received in the courtroom during the trial of the case.

This court has had occasion many times to construe section 3081, O. S. 1931, 22 Okla. St. Ann. § 857. We have held that on proof of a violation of this section by permitting the jury to separate after the case has been finally submitted to them, the defendant is entitled to the presumption that such separation has been prejudicial to him, and the burden of proof is on the prosecution to show that no injury could have resulted therefrom to the defendant. Sealy v. State, 59 Okla. Cr. 104, 56 P. 2d 903; Crow v. State, 39 Okla. Cr. 145, 263 P. 677; Chance v. State, 5 Okla. Cr. 194, 113 P. 996; Goins v. State, 9 Okla. Cr. 35, 130 P. 513.

This court has also uniformly held that before the final submission of a case, the legal presumption is that jurors perform their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact that during an adjournment of the trial the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial or that his substantial rights were prejudiced thereby. Forester v. State, 36 Okla. Cr. 111, 252 P. 861; Womble v. State, 50 Okla. Cr. 108, 296 P. 515; Sanders v. State, 46 Okla. Cr. 298, 287 P. 842; Weatherholt v. State, 9 Okla. Cr. 161, 131 P. 185; Smith v. State, 19 Okla. Cr. 14, 197 P. 514; Lemke v. State, 56 Okla. Cr. 1, 32 P. 2d 331.

In the Lemke Case, supra, the following rule was adopted:

"Where, in a capital case, after final submission, the jury are held together by the bailiff overnight at a hotel

and after they have retired to their rooms one juror is permitted to answer a proper telephone call from his family and is accompanied by the bailiff to the telephone on the next floor, such brief departure from the other jurors is not the separation contemplated by the statute. * * *"

We find that the proof affirmatively discloses here that the defendant was not prejudiced by reason of the fact that one of the jurors talked over the telephone and that another was called to the telephone but did not talk, and that such action did not deprive the defendant of a fair and impartial trial or deprive him of any of his substantial rights.

The defendant next complains of the action of the jury in coming to the courtroom and inspecting the exhibits which had been admitted in evidence by both the state and the defendant in the trial of the case, and contends that such action of the jury is receiving evidence in the trial of a case in the absence of the defendant.

The record shows that various articles of furniture which were in the bedroom of the deceased the morning of her death were arranged in the courtroom in the presence of the jury during the trial of the case. After hearing the evidence concerning the actions of the jury in this matter, the court made the following finding:

"So far as the jury being permitted to be brought into the courtroom for the purpose of viewing these exhibits which had been offered in evidence and which had been placed in certain positions by witnesses who were acquainted with the manner in which these exhibits were located in the room prior to the fire, it appears to me that these exhibits, being bulky and hard to move and take upstairs to the jury room—it occurs to me that the jury should have been permitted to view them in this courtroom in the same positions that they were placed by the witnesses. I can see possibly where if the jury had sent

down to the courtroom and had these exhibits brought up to them for the purpose of examining them and placing them in certain positions in the jury room, that it might have been prejudicial to the rights of the defendant, for they could not probably have been placed there in the same manner and in the same condition that they were placed by the witnesses. I do not think there is anything in the point that they took evidence outside of the presence of the defendant; they merely examined exhibits which had been offered in evidence and which had been examined by the jury previously in the presence of the defendant, maybe not so minutely as they examined them when they came in here after they were deliberating on the case, but a juror certainly has the right or the jury certainly has the right to view exhibits brought to them in the jury room for their inspection and examine and read, in case they were written, and as I have stated, since these were bulky exhibits, it seems to me it would have been much better for them to have been permitted to make their examination in the courtroom while they were in the same position as they had been placed by these witnesses, rather than to have them brought to the jury room and put in different places."

We agree with the view of this matter which was taken by the trial court. These articles had been properly identified and received as evidence in the case. They had been arranged in the courtroom at the request of the defendant. They were too bulky to be taken to the jury room. It does not appear that they were used or handled in a manner not consistent with the evidence.

Error is never presumed; but every presumption favors the regularity of proceedings had upon the trial, and to be available error must be affirmatively shown. No injury is pointed out, and no prejudice to the substantial rights of the defendant appears; and we are of the opinion that there was no error in that regard. Saunders v. State, 4 Okla. Cr. 264, 111 P. 965, Ann. Cas. 1912B, 766; Keeney

14

v. State, 53 Okla. Cr. 1, 6 P. 2d 833; Brown v. State, 52 Okla. Cr. 307, 4 P. 2d 129; White v. State, 20 Okla. Cr. 182, 201 P. 522; Hopkins v. State, 9 Okla. Cr. 104, 130 P. 1101, Ann. Cas. 1915B, 736.

As a general rule the findings of the trial court upon an issue of fact, arising upon affidavit and evidence introduced on a motion for a new trial, will not be disturbed where the evidence reasonably tends to support such finding. The evidence here reasonably supports the finding of the trial judge on this question. Horton v. State, 10 Okla. Cr. 294, 136 P. 177.

The defendant sets up as one of the grounds for reversal, without arguing the same, the giving of instructions Nos. 7, 8, 9, and 10.

The instructions complained of read as follows:

No. 7: "If you find from the evidence, facts and circumstances in proof, beyond a reasonable doubt, that in the county of Osage, state of Oklahoma, on or about the 10th day of June, 1938, the defendant Charles T. Wilcox did then and there wrongfully, willfully, unlawfully and feloniously, and without authority of law, and with a premeditated design to effect the death of one Josephine Rogers, make an assault in and upon said Josephine Rogers with his hands by applying pressure to the neck and body of said Josephine Rogers with such force as to choke and strangle the said Josephine Rogers, or with such force as to break the neck of said Josephine Rogers, and that as a result of said injury so received the said Josephine Rogers came to her death, then and under such circumstances it would be your duty to find the defendant guilty as charged in the information.

"Unless you should so find, it would be your duty to find the defendant not guilty."

No. 8: "In case you should find the defendant guilty, it would be your duty to fix his punishment at imprisonment in the state penitentiary for life or by death."

No. 9: "You are instructed that the state relies for a conviction in this case upon what is known as circumstantial evidence; and in this connection you are instructed that, to warrant a conviction upon circumstantial evidence, each fact necessary to the conclusion sought to be established—that is, the guilt of the defendant—must be proved by competent evidence, beyond a reasonable doubt; and that all the facts and circumstances proven should not only be consistent with the guilt of the accused, but consistent with each other, and inconsistent with any other reasonable hypothesis or conclusion than that of his guilt, and sufficient to produce in your minds a reasonable moral certainty that the accused committed the offense charged against him. And you are instructed that when the circumstances are sufficient under this rule herein given you, they are competent, and are to be regarded by the jury as competent for your guidance as direct evidence."

No. 10: "You are instructed that the defendant herein claims that the deceased came to her death as the result of being burned. And in this connection, you are told that if you find from all the evidence, facts and circumstances in proof that the deceased met her death from any causes other than those alleged in the information herein, or if you entertain in your minds a reasonable doubt thereof, it would be your duty to acquit the defendant."

We have carefully read these instructions, together with all of the other instructions given by the court. No requested instructions were submitted by the defendant. . The instructions given above are such instructions as have been approved many times by this court. The trial court is to be commended upon the instructions given in this case. They thoroughly cover the law on all points raised, and we fully approve all of them.

Lastly, the defendant contends, without argument or citation of authorities, that the court erred in his rulings during the trial of said cause upon certain evidence offered by the state to which objection was made by the defen-

dant and to the rejection of testimony offered by the defendant to which objection was made by the state.

It would have been exceedingly unusual if the trial court had gone through five days of testimony and had committed no error in his various rulings upon questions asked different witnesses. This case was ably and energetically presented by both the counsel for the state and the defendant. Many times during the trial of this case objections were made by one side or the other. A careful review of the record discloses that the court's rulings on these objections were practically all correct. In those few instances in which the court was mistaken upon his ruling, the mistakes were about evenly divided between the state and the defendant; and it is apparent to us that the defendant has not been prejudiced by any ruling of the court during the trial of this cause.

A judgment will not be reversed on account of the exclusion of evidence or for the improper admission of evidence unless upon an inspection of the entire record the court is of the opinion that there has been a miscarriage of justice, and that the errors are a substantial violation of a constitutional or statutory right. Ray v. State, 35 Okla. Cr. 322, 250 P. 438; Knox v. State, 34 Okla. Cr. 300, 246 P. 665; Newman v. State, 35 Okla. Cr. 296, 250 P. 554; Offitt v. State, 5 Okla. Cr. 48, 113 P. 554.

The defendant's theory of the case was fairly presented to the jury, but the physical facts were so overwhelmingly contrary to the contentions of the defendant that it is clear that the jury could have arrived at no other verdict than the guilt of the defendant. This is one of the most heinous and outrageous crimes ever committed in this state, and one in which a jury would have been fully justified in giving the extreme penalty. Because of

the age of the defendant and his previous good reputation, the jury has seen fit to give the defendant a sentence of life imprisonment rather than the extreme penalty.

Upon consideration of the record as a whole, we are of the opinion that the defendant has had a fair and impartial trial, with every right accorded him that the law requires or justifies; and it would have been a miscarriage of justice, as we think, if upon the evidence any other verdict had been rendered.

The judgment of the district court of Osage county herein is accordingly affirmed.

DOYLE, P. J., and BAREFOOT, J., concur.