## RUTHERFORD v. STATE.

No. A-11552.  May 7, 1952.

Rehearing Denied June 11, 1952.

(245 P. 2d 96.) ·

John W. Porter, Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL; J. Floyd Rutherford, hereinafter referred to as defendant, was charged in the district court of Muskogee county with the crime of murder, was tried before a jury, convicted, and his punishment was by the jury fixed at life imprisonment in the State Penitentiary. Appeal has been duly perfected to this court.

For reversal counsel for defendant has assigned five specifications of error, and being:

"1. The court permitted the jury to separate overnight on October 10, 1950, during the trial of the cause after hearing a great portion of the evidence, when it was evident to the court in the trial court room and in the hallway immediately outside thereof that there were many hostile witnesses and persons to the defendant.

"2. The court permitted the jury to separate upon taking a recess by the court without addressing the jury in any way or manner or placing the jury in the custody of any officer of the court during such recess.

"3. The verdict is not sustained by sufficient evidence.

"4. The verdict is excessive and not justified by the evidence, and is contrary to the evidence.

"5. The verdict is contrary to law."

Counsel argues the last three specifications together, and for convenience we shall consider them first, as an examination of the evidence is required.

The state used thirteen witnesses in making out its case. The defendant testified in his own defense, and used six additional witnesses, and thereafter the state used nine witnesses in rebuttal.

The evidence discloses that the defendant had about two years prior to the difficulty here involved moved from California to Boynton, Oklahoma, and had established a retail grocery. He had two women clerks, Della Liest, who had lived in and around Boynton since 1927, and a Mrs. Vincent Sager, who had lived near Boynton for about two years. At the time of trial she had gone to California, and her evidence given at time of preliminary hearing was read to the jury at the instance of counsel for defendant.

Defendant's wife also clerked at the store, and there were living quarters in the rear, but the wife was away from Boynton at the time of the shooting.

The evidence is undisputed that Floyd Spencer, whom defendant was charged with shooting, was the town marshal of Boynton, and had been for about two years prior to his death; that he had prior thereto been the town marshal at Fort Gibson for a number of years, and had lived in and around Fort Gibson the greater portion of his life.

Della Liest, one of defendant's clerks, testified that the morning of January 21, 1950, when she came to work defendant told her that he had been drunk the night before, and asked her not to tell his wife, who was away. She stated: "I would say that he was drinking or was just about drunk at that time. He wasn't drunk but he was full, or tight, or whatever you would call it." She was asked on cross-examination: "Did he have any difficulty . in walking around there in the store? A. No, but he didn't do very much in the store that day. He was just in and out. I think he did deliver some groceries to somebody that morning, but I don't remember now who it was."

Scott Morgan testified that he had lived in Boynton 44 years and had served as a deputy sheriff in Boynton for 18 years; that he had not been an officer for about two years and operated a pool hall and beer parlor; that he was acquainted with the defendant and that he went to his store at about 8 o'clock the morning of January 21, 1950; that defendant produced a pint bottle of Hill & Hill whiskey which was about half full and asked witness to have a drink, and that he and defendant took a drink. Witness further testified that defendant came to his place of business about 10 o'clock that morning and drank some beer. That in the afternoon he came back and wanted some more beer, but witness pretended that he did not have any cold beer at the time. Witness gave as his reason for such refusal that in his opinion the defendant was drunk. Witness asked his wife not to sell defendant more beer, but the evidence showed that she did sell him another bottle while witness was busy in the pool hall in the rear. Witness Morgan swore that defendant said to him: "You just don't want to sell me any"; and then defendant said, "Why does everybody think its such a disgrace for me to get drunk?" and witness told him, "I'd never heard anything about it", and then defendant said, "Have you ever been hurt?" and witness answered, "Yes, I've had my neck broke a couple of times", and defendant replied: "How would you like to eat some hot lead?" Witness said, "I couldn't digest hot lead", and defendant said: "Any time they try to put me in that little old jail house they are going to eat some hot lead." Witness stated that the defendant then left his place and went outside and walked on up the street with Hugh Miller, who had been standing on the sidewalk. Witness stated that a few minutes later he was told about a shooting at defendant's store, a block away, and that he ran down there and found that Floyd Spencer had been shot and was then in Kelly's store next door, and that Spencer told him that the defendant Rutherford had called him in his store and shot him. Witness went in defendant's store and some others took defendant to the back of the store and put him on the bed, and defendant said, "I sure as hell beat him shooting."

Hugh Miller testified that he saw the defendant about 2:30 p.m., January 21, 1950, and in his opinion he had been drinking. That Buck Wheeler offered to drive defendant to his store and he refused the offer, but accepted the offer of witness to walk with him to the store. Miller stated that on entering the store defendant walked to the back, took off his overcoat and put it on a broom holder rack, and, quoting witness: "And then he looked out towards the street and he said, 'That fellow had been following me'—I was facing the other way and I didn't see who it was, so he says, 'that fellow has been following me, I'll go see what he wants', and he walked past me out to the front of the store." He testified that thereafter Rutherford came in the store, backing up, and that Floyd Spencer was in front of him and that Spencer said, "Give me your gun" and kept repeating it, and when they got in the store "made a little heavier suggestion to that effect and Mr. Rutherford said, 'I'll never give you my gun', and the next thing I knew he shot him." Witness stated that Spencer had drawn his gun after defendant refused to give up his gun, but that he did not fire it until after the defendant had fired two shots; that witness did not know when defendant drew his gun as his back was toward witness; that these shots apparently struck Spencer and he started to fall and seemed paralyzed and said, "You have killed me." He then started to shooting at defendant. The gun of defendant showed five exploded shells, and one that was apparently snapped; and the gun of Spencer showed six exploded shells.

Mrs. John Kelly, who with her husband operated the grocery adjoining defendant's store, on the afternoon of January 21, 1950, saw defendant come to the front of his store and motion to Floyd Spencer to come into his store, and that Spencer followed defendant. She was asked: "How soon after you had seen Mr. Rutherford motioning and then Mr. Spencer walk by until you heard those shots? A. Oh, it would just give them long enough to walk in the door of his store."

Adeline Howell stated that she had lived around Boynton for 30 years; that on the afternoon of January 21, 1950, she was in the defendant's store near the front door; there were a number of other customers; that she had her back to the door when she heard somebody say, "Don't pull your gun out", and she looked and saw the defendant throw his coat back and get his gun from his left side and that she ran out and then the shooting commenced.

Walter D. Bolton testified that he was investigator for the county attorney's office of Muskogee county, that he received information about a shooting at Boynton around 2:30 p.m. January 21, 1950, and immediately drove to the Rutherford grocery there and saw the defendant in his bedroom in the back of the store; that the defendant refused to make a statement to him concerning the reported shooting; that defendant had been shot in a leg and stated it hurt when he would try to move his leg; that he could smell the odor of intoxicating liquor on defendant; that he interviewed all the witnesses to the shooting, collected the empty shells and got both guns involved; that he saw Floyd Spencer who was apparently dying and who made a dying statement which he took down and had witnessed by two witnesses; that Spencer was too weak to sign the statement and was being given a blood transfusion at the time. The statement was as follows:

"My name is Floyd Spencer. I give this as my dying statement to Walter D. Bolton, County Investigator, Muskogee County, Okla. in the presence of Ada Spencer, Clyde Stacy.

"This afternoon about 2 o'clock Rutherford was running up and down the street in Boynton drunk. He went into his store, and after I passed there walking north just as I got in front of Kelly's store, Rutherford came out and

called to me and said, 'Come here, I want to see you.' As I walked into his store I could see he had a gun. He asked me what did I mean by following him. I told him I wasn't, but as drunk as he was he ought to stay off the streets, and I asked him to give me his gun. I asked him two or three time. He pulled his gun and shot me. I fell and then got back up on my knees and started firing back at him. My gun only fired twice. I am not sure how many times he fired at me. I have never had as much as a cross word with Mr. Rutherford."

Witnessed: "Clyde Stacy. Ada Spencer."

There were a number of other witnesses who testified to the facts of the shooting, and to the defendant having the appearance of being intoxicated the day of the shooting.

C. W. Campbell, a Baptist minister, testified to going to defendant's store at 3:30 p.m., about the time an ambulance came to take him to the hospital, and that he rode in the ambulance with defendant to the hospital at Muskogee. He rode in the front seat with the driver. He stayed in the room with defendant until about 7:30 p.m. He watched the physician dress defendant's wound. He did not smell liquor on defendant, and defendant did not act as if he were intoxicated.

The testimony of Mrs. Vincent Sager, given at the preliminary, was received in evidence on behalf of defendant. In it she stated that about 25 or 30 minutes prior to the shooting that the town marshal, Floyd Spencer, was in front of the Rutherford store and asked her where Floyd Rutherford was, and that she said: "He is back in the store there", and that he then said: "You tell that son-of-a-bitch he better stay off the streets." She stated that she then told Rutherford about this. She admitted that she did not tell the officer about this conversation when they questioned her right after the shooting.

Estel Smith testified that he had been a barber in Boynton for 35 years; that he shaved the defendant about noon on January 21, 1950, and could smell alcohol on his breath; that he would say he did not consider defendant drunk; that he talked smoothly.

Jim Guppy, 18 years of age, testified that he rode to the hospital in the ambulance with defendant and did not detect the odor of alcohol on defendant. This was his first experience in picking up a person suffering from a gunshot wound.

H. E. Kirkpatrick stated that learning there had been shooting he went to defendant's store and he was lying on the floor and at defendant's request he and a Mr. Haggard moved him to a bed in the rear of the store, and that he never detected the odor of liquor on defendant.

H. E. Watkins testified that right after the shooting in question he came out on the street and that a number of people were there and he said to the group that he thought he ought to go in Rutherford's store and look after him, and that Scott Morgan (who testified for the State) was there and said, "Just let the son-of-a-bitch die." Witness said his wife would not let him go to see about defendant.

The defendant next offered in evidence his exhibits 1 and 2 and being prison record from the Oklahoma State Penitentiary showing that Floyd Spencer was sentenced to that institution from Cherokee county and was received there February 22, 1918, for a term of 21 years for conviction of manslaughter, first degree; that he was paroled July 21, 1921, and pardoned April 12, 1926; and that he was 17 years of age when received. Exhibit 2 was a copy of the information in the case alleging that Floyd Spencer had assaulted one P. L. Torix

with a knife and that Torix died from wounds received at his hand. The court would not admit this evidence at the time, but later admitted Exhibit 1 after proper predicate.

Floyd Rutherford, defendant, testified that he came to Boynton October 21, 1948, and purchased a grocery; that he became acquainted with Floyd Spencer, the city marshal and deputy sheriff; that he would see him patrolling the streets; that he joined with other merchants and paid him $2 per month just to watch their stores at night. That one time he got him to serve some papers and that he warned him that the person he was to serve was pretty tough, and Spencer said, "I'm not afraid of him", and that he said: "I've killed three men, and I'm not afraid of him."

The defendant further testified as follows:

"Q. Just tell the jury now what happened at that time and what occurred leading up to it? A. I saw Floyd Spencer pass by the front door of the store about that time and he had already sent that message to me to keep off the streets and I wondered why he had said that because I was up and down the streets every day and had been out on the streets that day and I had never had any trouble with any peace officer and this day he had kept watching the store and kept coming by and looking in and he had sent me this word by one of my clerks to keep off the streets and I couldn't understand why he had sent word like that by one of my clerks instead of coming in the store and talking to me so when he came by the store this time I went out and he saw me and I motioned for him to come back and he turned around and came back and walked in the store and closed the door and I said, 'Spencer, what is the idea that I have to keep off the streets and why did you send such an order in to me?' and just then he drew his pistol and asked me for my gun. He asked me for it twice and when I didn't respond and when the customers that were in the store at that time saw him with his pistol they started running out of the store and he asked me again for my gun. He never did say that he was arresting me and I figured he was going to wait until I had started to put my hand on my gun and then shoot me so I pulled my gun and shot him twice. I didn't try to kill him because I didn't shoot to kill him. I intended to shoot him in his gun hand but it struck him in the hip and then he started shooting at me after he had squatted down there behind my wife's desk. I could have shot him in the head if I had been intending to kill him but I just meant to keep him from shooting me. He got up then and said, 'I'm going to finish you off', and he took another shot at me and hit me in the leg and shot again and hit me in the right arm and after he had used up the shots in his gun he got up and walked out of the store and he went right by me and I could have shot him again then in the head if I had been wanting to kill him, but I didn't want to kill him."

Defendant testified that after Mrs. Sager told him that Spencer had sent word for him to stay off the streets:

"I went up to the front of the store where I kept my gun under the cash register and got my gun and then went back to the back of the store and I put on a pot of coffee and made myself some coffee and then I got to wondering what I should do or who I should talk to about my having any trouble with him, so I decided then to go up and talk to Scott Morgan because one of the clerks in the store had told me that he used to be a deputy sheriff so I went out the back door and went up the alley and went in the back door of Scott Morgan's place and went through the pool hall and up to the front and I saw his wife there and asked her where Scott was and she said, 'He's over there fixing the coke machine,' so I saw him then and went over and asked him what I should do and told him Floyd Spencer had called me a son-of-a-bitch and had told me to stay off the streets and asked him what I should do about it and he said, 'I don't know what you should do about it'. He said, 'I'm not a deputy sheriff any more and there's nothing I can do about it and I don't know what you can do about it', so I walked out in front then and saw Mr. Miller there

and I talked to him a minute and then walked back to the store with him and when I got back to the store I went in and took off my overcoat and threw it over the broom rack there and then went back and closed and locked the back door that I had left open when I left and went up the alley to Scott Morgan's."

On cross-examination defendant admitted that he was convicted on December 4, 1946, in Pasadena, California, on a charge of driving an automobile while intoxicated, and that on April 8, 1921, in the State of Kentucky, he pleaded guilty to a charge of attempted robbery and was sentenced to one year in the **penitentiary.**

In rebuttal the state offered a number of witnesses who had known Floyd Spencer, the deceased, for most of his life and who testified that they were acquainted with his general reputation in the community in which he lived, Fort Gibson and Boynton, as being a peaceable, quiet and law-abiding citizen and that his reputation was good.

Dr. William N. Weaver, physician of Muskogee, was qualified as a witness and was asked and answered as follows:

"Q. The question I am asking you, doctor, might be stated this way in the form of a hypothetical question: the evidence in this case before the court and jury has been along this line, principally on the part of the State, that the defendant in this case was under the influence of intoxicating liquor just prior to the time a shooting occurred in the town of Boynton and during which time he fired several shots into the body of the deceased, who was the town marshal of Boynton. There has also been testimony introduced here by certain persons who talked to the defendant some thirty minutes to an hour after the shooting that they did not observe him to be in an intoxicated condition at that time—the question I want to ask you from a medical standpoint is whether or not a sudden excitement or shock such as being involved in a shooting and receiving a gun shot wound might be such as to make a person who was under the influence of intoxicating liquor at that time suddenly sober up immediately after such an incident as that had occurred? A. Yes, that is true. When handling a drunk if he is noisy and obnoxious and obstinate very often a slap in the face or a glass of water thrown in his face will sober him up and he will talk and act more sensibly after that, or, for instance, a man who is intoxicated will stumble or fall and injure his ankle and he is in pain and that will sober him up. Q. Then pain will have the effect of sobering up an intoxicated person? A. Yes, sir; or at least he will appear to be much less intoxicated than he was before to the casual observer."

James Spencer, son of the deceased, testified that he was 26 years old, that he lived at Fort Gibson, and had never heard his father say he had killed three persons, and to his knowledge he had never killed anybody.

Scott Morgan denied that the defendant entered his place of business by way of the back door on the alley the afternoon of January 21, 1950, and stated that he kept the back door locked from the inside at all times and such would not have been possible. He further denied that defendant had sought his advice. He stated that when defendant was in his place he offered to play anybody in the house a game of pool for $5, and "He said that they hadn't arrested him in Chicago and that they wouldn't arrest him there, and if they tried to they'd get some hot lead."

The above constitutes the high points of the evidence, though there was other cumulative evidence, some favoring the state and some favoring defendant.

This court has uniformly held that where evidence is conflicting or different inferences may be drawn therefrom, it is the jury's province to weigh evidence and determine facts, and their determination will not be disturbed unless it

appears that such determination was not sustained by competent evidence or was influenced by passion or prejudice. Salisbury v. State, 80 Okla. Cr. 13, 156 P. 2d 149; Graham v. State, 80 Okla. Cr. 159, 157 P. 2d 758; Spears v. State, 89 Okla. Cr. 361, 207 P. 2d 946; Wingfield v. State, 89 Okla. Cr. 45, 205 P. 2d 320; Little v. State, 79 Okla. Cr. 285, 154 P. 2d 772.

From a careful reading of the record and the instructions given by the court, none of which instructions were objected to, it is our conclusion that the case was fairly submitted and that the evidence overwhelmingly supports the verdict and judgment. This takes care of specifications 3, 4 and 5.

Considering the first assignment of error, that the court committed error in permitting the jury to separate over night during the trial, but prior to the submission of the case, we find from the record and admissions of counsel in brief that there was no request that the jury be held together. Counsel conceded that it is, as a rule, within the discretion of the trial judge to keep the jury together in a capital case or allow the jury to separate prior to the submission of the case, but by reason of his thought that there were many persons in Boynton unfriendly to defendant, that it was the duty of the court to have kept the jurors together. No attempt was made to show any actual prejudice suffered by the defendant. In Wilcox v. State, 69 Okla. Cr. 1, 99 P. 2d 531, 532, we said:

"Where the proof shows that the jury is permitted to separate after the case has been finally submitted, the defendant is entitled to the presumption that such separation has been prejudicial to him, and the burden is on the prosecution to show that no injury could have resulted therefrom to the defendant.

"Before the final submission of a case the legal presumption is that the jurors performed their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact that during an adjournment of the trial the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial, or that his substantial rights were prejudiced.

"The findings of the trial court upon an issue of fact arising upon evidence introduced on motion for a new trial will not be disturbed where the evidence reasonably tends to support such finding."

This court further reaffirmed the above principle of law in the recent case of Fry v. State, 91 Okla. Cr. 326, 218 P. 2d 643. See also 34 A. L. R., note, p. 1153, and 79 A. L. R., pp. 828-837.

The serious question for consideration in this case is assignment No. 2, wherein it is complained that the court permitted the jury to separate upon taking a recess during the trial, without any admonition on the part of the court and without the jury being in the custody of an officer. Surprisingly enough, this appears to be the first time this precise and exact question has had the attention of this court. The statutory provision is Tit. 22 O. S. 1951 § 854, and reads:

"The jury must also, at each adjournment of the court, whether permitted to separate or kept in charge of officers, be admonished by the court that it is their duty not to converse among themselves or with any one else on any subject connected with the trial, or to form or express any opinion thereon. until the case is finally submitted to them."

The record discloses that during the trial counsel for the defendant offered in evidence as defendant's exhibits No. 1 and No. 2, the penitentiary record of a Floyd Spencer, and a copy of an information setting out a charge against said Spencer of which it was asserted he had been convicted and was subsequently

confined to the penitentiary. No evidence had been introduced to show that the Floyd Spencer referred to was the one and same person as deceased, so that the county attorney objected to the introduction of said instruments, and interposed a number of reasons, and the court stated: "We will take about a fifteen minute recess at this time." The attorney for the defendant then dictated the hereinafter objection to the reporter, which apparently never came to the attention of the court, and which was dictated as the judge made his way to his chambers where it seems he was in the habit at times of hearing arguments out of the presence of jurors and spectators. The objection reads:

"Let the record show that the court has just taken a recess at this time without any instructions to the officer in charge of the jury, and that the jury left the jury box and went out into the hall and that the court and the attorneys then adjourned to the presiding judge's chambers to argue the question of law."

Counsel in his motion for new trial set out as one ground:

"5. The court permitted the jury to separate upon taking a recess by the court without in any way or manner admonishing the jury not to converse among themselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the case is finally submitted to them, or in any other way or manner admonish the jury, and did not, upon taking such recess place the jury in charge of any officer or other person or persons, and upon such permission of the court the jury did separate and leave the court room and into the hallway immediately outside thereof where there were many State's witnesses, and many other persons were there assembled, hostile to the defendant. That upon taking such recess the presiding judge immediately went to his chambers in the absence of the jury."

Counsel for defendant on hearing of the motion for new trial sought a stipulation that such recess was taken without the admonition. The Court stated:

"That might be true upon the taking of just a short recess, but I am sure that every time that court adjourned I admonished the jury. That was just a short recess for a few minutes while we were arguing the question of the introduction of certain evidence or exhibits offered by the defendant. That's my recollection that was what it was for."

Counsel for defendant then offered the evidence of one Dora Sager, a spectator at the trial to show that the jury was not admonished, and did separate and were not in charge of the bailiff. Counsel then stated:

"Mr. Porter: That's all the evidence we have to present at this time in regard to our motion. I would like for the reporter's notes to be introduced in evidence as a part of this hearing, showing what took place at the time of that paritcular recess that we have been discussing.

"The Court: The record will show what occurred at the time and the transcript of those proceedings may be made a part of the record and considered by the Court at this time.

"Mr. Porter: That's all then."

The record discloses that the court did give the statutory admonition when the court adjourned for lunch the first day of the trial, which was prior to the recess in question, and also when the court was adjourned for the day.

The court reporter was not called on hearing of motion for new trial, so that it is apparent that the trial court was unaware of the heretofore quoted objection that counsel had dictated to the reporter at the time of the separation of the jury. It is unthinkable that the trial court would have permitted even a recess without admonishing the jury or that he would not keep the jurors

together if counsel for defendant had requested it, giving as cause, his now-claimed hostility of spectators.

Counsel claims that the cases of Brink v. Territory, 3 Okla. 588, 41 P. 614; Redman v. Territory, 2 Okla. 360, 37 P. 826, and the basic case of State v. Mulkins, 18 Kan. 16, cited with approval in the first two cases, are decisive of the question now raised.

In the case of Yarbrough v. State, 13 Okla. Cr. 140, 162 P. 678, 679, where the court in the midst of a trial, and before the case was submitted to the jury, permitted the jury, during a recess, to separate, saying to them, **"Gentlemen, under the previous admonitions of the court you may be excused"**, this court held among other things that, "if defendant desired that a bailiff be in charge of the jury, or that the court specifically repeat the statutory admonition, he should have requested it, but, having acquiesced by silence, he will not now be heard to complain."

This principle was later applied in Sanders v. State, 46 Okla. Cr. 298, 287 P. 842, and Langley v. State, 53 Okla. Cr. 401, 12 P. 2d 254.

It is at once apparent that this court does not favor counsel in a criminal case keeping quiet, or in common parlance be guilty of "hiding behind a log" with the hope, if not actual effort, of having error in the record. Good faith requires that he speak.

But it might be argued that here by reason of the total failure of the court to give any admonition, the above cases are not exactly in point, and the principles therein should not be extended in view of the statutory language of § 854 of Tit. 22 O. S. 1951, and that in any event, the outcome of this case should be governed as contended by defendant by the Brink, Redman and Mulkins cases, supra. Accordingly, we should delay our conclusion as to this application for a consideration of the cases in question.

In the Redman case it is not clear whether the court had adjourned for the night, or whether only short recesses were involved. At any rate, the defendant did not prevail by reason of failure to properly raise the issue. There is nothing in the opinion to show that defendant there discovered the omission until after trial, but his attorney failed to raise the issue in motion for new trial. In the Brink case it seems that it was claimed that the court failed to admonish the jury and permitted the jurors to separate at will during recesses and at night, but there the issue was not properly raised. There was no evidence in the record that the court did in fact fail to admonish the jury. These two cases depend on State v. Mulkins, supra, for the rule of law in such cases approved and now contended for by defendant.

In the Mulkins case, 1877, there not being sufficient time the first day to complete the trial, the cause was adjourned at about 6 p. m., until the next morning at 8:30. During the adjournment the jurors were allowed to separate, but they were not admonished as required by Sec. 235 of the Criminal Code, which in material respects is similar to § 854 of Tit. 22 O. S. 1951, here involved. In an opinion by Valentine, Justice, concurred in by Justices Brewer and Horton, and being a strong and respected court indeed, the conviction of Mulkins for a heinous crime was reversed by reason of the oversight stated.

There in an important distinction, however, between the facts in the Mulkins case and the facts in the within case in that here the recess of the court was but for a few minutes, while the court was hearing argument on a point of law in his chambers, and after the court had previously given the statutory

admonition when the court was recessed for the lunch hour, while in the Mulkins case, the court had adjourned over night without such admonition, and nothing appears factually to show that the jurors had ever prior to such adjournment been admonished. It was alleged and shown that a spectator at the trial actually discussed the case with a juror the evening and the morning of such adjournment. This of course would have constituted a ground for new trial, even though the jury had without question been properly admonished. Seemingly, the jurors never learned that it was not lawful for them to discuss the case among themselves prior to final submission or to talk with others. In a later case (1880) in State v. Stackhouse, 24 Kan. 320, cited in 34 A. L. R. 1154, note, the Supreme Court of Kansas when still made up of the same judges as in the Mulkins case, in an opinion by Brewer, Justice, refused to reverse a case where the trial court gave the statutory admonition at each adjournment, but failed to do so at a number of short recesses during the trial. The court recognized a distinction between a short recess and an adjournment. Said the court, in the body of the opinion:

"Doubtless the better practice is, to repeat the admonition whenever the jury pass out of the sight of the court, and if the recess is protracted, it may fairly be considered as tantamount to an adjournment, but when the recess is brief, and an admonition is previously given, and extends by its terms during the whole trial, and the record discloses a trial otherwise fair and impartial, it seems like sacrificing substance to form to reverse a judgment and compel a new trial for an error as trivial and unlikely to have wrought injury. We would not take away any substantial rights from an accused; the forms of proceedings, prescribed by statute must be followed; but trifling errors may be disregarded. With some hesitation we overrule this objection."

From the history of § 854, it appears that it was first enacted in Oklahoma Territory as St. 1890, § 5660, then St. 1893, § 5225; St. 1903, §5513; Comp. Laws 1909, § 6852; R. L. 1910, § 5900; Comp. St. 1921, § 2717, and that the statute was copied from Dakota Territory, 1887, § 7400.

In 1929 the Supreme Court of North Dakota in the case of State v. West, 57 N. D. 652, 223 N. W. 705, had occasion to construe its statute (now 29-2128, N. Dak. Rev. Code 1943; which in wording was and is practically identical with the Territorial statute, and with the Oklahoma statutes) and recognized a distinction between adjournment as mentioned in the statute and temporary recess or cessation of proceedings. Said the Court

"A temporary cessation of proceedings before a jury in a criminal case, for the purpose of hearing a motion, during which time the jury was requested to retire to the jury room and remain there until they were called, is not an adjournment, within section 10858 of the Compiled Laws of 1913, which requires an admonition to be given at each adjournment."

Words and Phrases, Vol. 2, p. 407, perm. ed., cites the cases of French v. Ferguson, 77 Wis. 121, 45 N. W. 817, 818, and People v. Draper, 28 Hun 1, 1 N. Y. Cr. R. 138, 141. In the latter case the court said:

"In Code Cr. Proc. § 415, providing that the jury must at each adjournment of the court be admonished, 'adjournment' means an adjournment from day to day or for a longer time, and not a recess taken during a single day's session. An 'adjournment' says Blackstone, is not more than a continuance of the session from one day to another, as the word itself signifies; and hence taking a recess for dinner was not an adjournment requiring an admonition to the jury."

See, also, 23 C. J. S., Criminal Law, § 1361; 53 Am. Jr. § 890; 34 A. L. R. 1153; and reference to any law dictionary or standard dictionary, or to Roget's

Thesaurus will demonstrate that there is a basic distinction between the word "adjourn" and the words "recess" or "intermission."

We cite the Wisconsin and New York cases above merely for the purpose of showing how far some courts have gone in recognition of the distinction between "adjourn" and "recess" and we refuse to go so far, but do approve the degrees of distinction as recognized in the Stackhouse and West cases, supra.

It is, therefore, our conclusion that a court, at every separation of the jury and at each adjournment in a criminal trial should give the statutory admonition and at least an abbreviated admonition referring to the previous full admonition at each temporary cessation of proceedings, but where it appears, as here, that at the first adjournment, and before any separation of the jury was had, the court had given the statutory admonition, and that the admonition was duly given at each adjournment thereafter, and the record discloses a trial otherwise fair and impartial, the judgment will not be reversed simply because during the session of the court a temporary intermission or recess (while the attorneys retired with the judge to his chambers to consider the admissibility of certain documentary evidence offered by defendant) took place without the admonition being given as a preliminary thereto.

But in this case it is the further conclusion of this court that counsel for defendant waived the oversight of the court in failing to re-admonish the jury, although set out in his motion for new trial, in that counsel for defendant was aware of such oversight and refrained from advising the trial judge of the irregularity now complained of, but dictated an objection to the court reporter, which never came to the attention of the court.

If counsel thought the hall outside the courtroom was crowded with persons hostile to his client, he should have immediately insisted on the court admonishing the jury and keeping the jurors together, and if the court had refused he should have moved for a mistrial; or, if counsel too had overlooked this, and did not dictate the heretofore objection until after court reconvened, he should have called the attention of the judge to the dictated objection so that the judge could have had opportunity to question the jurors at the time as to whether anyone had conversed with them, or they had conversed among themselves (as was done in Little v. State, 79 Okla. Cr. 285, 290; 154 P. 2d 772) about the facts of the case on trial. And this in order that the court on its own volition, whether so requested by counsel or not, could have decided whether the substantial rights of the defendant had been violated and whether or not he should declare a mistrial.

Counsel as an officer of the court as well as counsel for the defendant should have been anxious at the time to find out if any impropriety had actually taken place and the best way to have found out would have been to have given the court opportunity to question the jurors, under oath. The court could have handled this in such manner as to have not prejudiced either the defendant or the State in the eyes of the jury.

If the court had failed either prior to the argument in his chambers, had the same been called to his attention, of admonishing the jury, or had on reconvening of the court failed to question the jurors as to any impropriety, then such failure would have properly constituted a ground for new trial and on hearing of motion the rules announced in the Brink and Redman cases would probably have applied, and the burden would have been on the State to have shown that no impropriety actually took place.

Considering the record as a whole, we find that the defendant had a fair and impartial trial, and that no substantial right was violated.

The judgment is accordingly affirmed.

BRETT, P. J., and JONES, J., concur.