## IGO v. STATE.

### No. A-11862.

Criminal Court of Appeals of Oklahoma.

Jan. 20, 1954.

Supplemental Opinion on Rehearing
March 24, 1954.

1084 

Austin R. Deaton, Jr., Ada, for plaintiff in error.

Gordon & Whyte, McAlester, for plaintiff in error on Rehearing.

Mac Q. Williamson, Atty. Gen., Owen J. Watts, Asst. Atty. Gen., Oklahoma City, H. M. Shirley, County Atty., Coal County, Coalgate, for defendant in error, Wayne W. Bayless, Oklahoma City, of counsel.

POWELL, Presiding Judge.

Jim Igo, plaintiff in error, hereinafter referred to as defendant, was charged by information in the district court of Coal County with the crime of murder, a second and subsequent offense. He was alleged to have on or about the 21st day of April, 1952, murdered his wife, Pearl Igo, by beating and choking and by strangulation. The jury found the defendant guilty as charged, and assessed his punishment at confinement in the State Penitentiary for the term of his natural life.

The record is voluminous. Many witnesses testified. And while the evidence was in nature circumstantial, the circumstances proven were consistent with each other and with the hypothesis that the defendant was guilty, and at the same time inconsistent with any other rational hypothesis. But the sufficiency of the evidence is not one of the grounds forming the basis for appeal. Counsel for the defendant advances some five propositions as grounds for reversal. With the exception of the proposition that the court erred in not granting the defendant a continuance, the thesis of complaint revolves around the alleged prejudicial manner and conduct of the private attorney (now an assistant Attorney General) employed in the prosecution of the case. There can be no doubt but that the special prosecutor vigorously prosecuted the accused and his enthusiasm in instances may have dimmed his better judgment. Our task is whether or not the actions complained of prevented the defendant from having a fair trial. The propositions are excellently presented and deserve close consideration.

Counsel, of course, does not concede that the evidence is of such conclusive character as to outweigh that of the accused and his witnesses, but recognizes

the well-settled rule that where there is any competent evidence to support the verdict of the jury and judgment of the court that the same will not be disturbed by this court, absent fundamental error or error preventing the accused from receiving a fair and impartial trial. Riddle v. State, 92 Okl.Cr. 397, 223 P.2d 379; Smith v. State, 55 Okl. Cr. 214, 28 P.2d 587; Jones v. State, 20 Okl. Cr. 233, 202 P. 187; Neill v. State, 89 Okl. Cr. 272, 207 P.2d 344; Woolridge v. State, 93 Okl.Cr. 245, 225 P.2d 1028; Roberts v. State, 82 Okl.Cr. 75, 166 P.2d 111.

Nevertheless, under such a situation a summary of the evidence at this point may be helpful, and in fact appears imperative, as it will have some bearing in our consideration of the objections advanced. That is to say, where the evidence in a case is weak and there is basis in the record to support other propositions of error raised, this court in the interest of justice and fairness, in the face of the rule stated, and the further rule that this court will not weigh the evidence, will, under the circumstances indicated, seek to refer the case back for a new trial where such action can reasonably be justified. And this, even though the objections raised are in nature technical; and always where the error demonstrated is fundamental error. This principle is illustrated under varying factual situations in Leeks v. State, Okl.Cr., 245 P.2d 764; McMahan v. State, Okl.Cr., 251 P.2d 204; Dupree v. State, 10 Okl.Cr. 65, 134 P. 86; Scribner v. State, 3 Okl.Cr. 601, 108 P. 422, 35 L.R.A.,N.S., 985; Hilyard v. State, 90 Okl.Cr. 435, 214 P.2d 953, 28 A.L.R.2d 961; Louis v. State, 92 Okl. Cr. 156, 222 P.2d 160; Leach v. State, Okl. Cr., 235 P.2d 968; Leeth v. State, Okl.Cr., 230 P.2d 942; Ridenour v. State, Okl.Cr., 231 P.2d 395.

And on the other hand, where the evidence, (and even where circumstantial) is so conclusive of the guilt of an accused as to leave no reasonable doubt in the mind of one reading the record, we will seek to uphold the judgment unless the error complained of is of such a fundamental nature and so firmly established as to require a reversal. For cases illustrating this principle, see Fields v. State, 85 Okl.Cr. 439, 188 P.2d 231; Wininegar v. State, Okl.Cr., 257 P.2d 526; Hathcox v. State, Okl.Cr., 230 P. 2d 927; Rutherford v. State, Okl.Cr., 245 P.2d 96; Dissent in Roberson v. State, 91 Okl.Cr. 217, 218 P.2d 414; Williams v. State, Okl.Cr., 240 P.2d 1132, 31 A.L.R.2d 851; Brinegar v. State, Okl.Cr., 262 P. 464.

The basis for such rule, as is readily apparent, is the principle supporting the harmless error doctrine as enacted into statutory law in this State, 22 O.S.1951 § 1068, and many times construed by this court under varying factual situations, as may be found in addition to the cases cited, from the annotations set forth under the statute just mentioned, and in various digests.

The evidence developed that the deceased, Pearl Igo nee Avanzini, a native of Coalgate, Oklahoma, was a widow at the time she became acquainted with the defendant, in Wichita, Kansas. That at such time defendant had a wife in a tuberculosis sanatorium, but paid court to the deceased and married her about one month after his wife died, and soon moved to Coalgate to live in a home owned by the deceased. She borrowed money to enable her husband to engage in the scrap iron business. Her family was an old and respected family of the Coalgate area. Defendant was addicted at times to the use of alcohol. He and his wife Pearl had lived in Coalgate for about seven or eight months prior to the evening she came to her death.

Amelia Avanzini testified for the State that she was a younger sister of Pearl Igo, and lived with the mother in Coalgate. That when her sister Pearl and the defendant Jim Igoe first moved to Coalgate they lived in the Johnson Apartments about seventy-five yards from where she and the mother lived. That between January 5, and 10, 1952 was the first time she found out that her sister and Igo were having trouble. That she heard her sister Pearl calling to her and she rushed out and that Igo was after his wife, who fell in a ditch, and when witness inquired as to the trouble, the sister said: "He is always after me

about money, money—he thinks I have money." She stated that the next evening she observed that her sister was black and blue around her throat and arms, and that the following morning she came to the home of witness with her head wet and said that the defendant had held her head under a hydrant and had choked her; that she had a cut on her leg and said that defendant pushed her against something. No objection was made to this evidence. On cross-examination when asked about the frequency of the visits of Pearl and the defendant to her home, witness said: "Yes sir, they would come very often until he would start to abusing her. She would come over to Mother's nearly every afternoon. Sometimes she would come and sometimes he would come."

Joe Avanzini, brother of the deceased, testified to seeing his sister at least three times after her marriage to the defendant when she had black and blue bruises under her throat.

This was the State's partial picture of the relationship of Jim Igo with his wife Pearl, at Coalgate during the few months after their marriage and prior to April 21, 1952.

The evidence for the State further developed that on the 21st day of April, 1952 between 3:30 and 4 o'clock in the afternoon the defendant appeared at a beer tavern south of Coalgate operated by Jack Ruffini and Louis Ghigo and purchased a half pint of whiskey and took a drink out of it. That one Owen Summers later purchased a half pint and that Igo, Summers and another drank the two half pints. Igo argued heatedly with Summers concerning purported free work on the construction of a V.F.W. building Igo was interested in promoting. About 6:30 P.M. Summers left in his truck for a live stock sales barn a short distance south, and Igo followed and they settled their argument there. They were gone about ten minutes. Summers testified that while the defendant had been drinking that he would not say that he was drunk. There was evidence that Igo at the tavern threatened to whip Summers and told him that he "had the difference."

Ghigo testified that he told Summers to get in his truck and leave because he did not want any trouble around there. Ghigo testified that the defendant in two or three minutes returned to his place and wanted a half pint of whiskey and he told defendant he did not have any. Witness further testified that about twenty minutes before seven o'clock that evening Pearl Igo drove up in front of his tavern in a green Chevrolet automobile; that defendant purchased two coca colas and witness took them out to the car to Pearl, and she drove off and the defendant came back in; that the 'phone soon rang and Pearl told witness not to sell Igo any more whiskey. Witness told her that her husband was fixing to leave. Pearl soon drove back and defendant was in his truck in the back and leaving and Pearl turned her car around and followed him toward Coalgate. This witness swore that around 7:30 his 'phone rang again and Pearl had an angry tone to her voice and warned him not to sell her husband whiskey and threatened him with the sheriff, Thea Bonner, and he stated that then the conversation was abruptly broken off, and "the receiver was put on the hook kinder rough-like". Witness further stated that in a few minutes after this, or about 8 o'clock the defendant reappeared at his tavern driving a green Chevrolet and wanted a drink, but witness advised him that he did not have one. Defendant then wanted to know when was the last time he had seen Pearl, and witness told defendant that he saw her turn around and follow him when he drove off in his truck from the rear of the tavern. Witness could not say whether defendant was under the influence of intoxicating liquor or not. He left about two minutes after eight, and witness stated that about 8:20 he learned of Pearl Igo's death.

This witness was corroborated in the main by two customers, Arthur Pope and Leo Bey, as to the various appearances of the defendant at the tavern. Other customers testified to the earlier incidents.

Harry R. Howe, who operated the Willys-Overland Agency in Coalgate testified to seeing defendant pull out from the

Lakeside Tavern and head toward Coalgate, driving a Chevrolet truck, and saw his wife Pearl driving a two-door green Chevrolet car following, and saw them drive to their home about a half block off the highway in Coalgate, and saw the defendant get out of his truck as witness passed. This was about 7:15 P.M.

A. W. Ruth, a carpenter, had been to see his mother who was visiting at the Potts home about a block from the Igo home, on April 21, 1952 and he left the Potts house at 7:28 to return to his home and passed the Igo home about 7:30 and noticed Igo's truck parked there, and also noticed the wife's green Chevrolet parked there.

George Welty, 76 years of age, and an old-age pensioner, testified to having known Pearl Igo for thirty years, and her husband for a few months; that they lived right across the street, a little south of due west, and a distance of about 150 feet. He stated that there had been a bad storm cloud the afternoon of April 21, and that he sat watching the weather through his northwest window, and saw Pearl Igo take two children to the cellar; that around 7 o'clock she took them in her car and left; that soon her husband drove up in his truck, got out and went in the house and a couple of minutes later he saw Pearl drive up in her car but she parked on the west side of the house; that he was then reading his newspaper; that there were double windows in the southeast bedroom of the Igo home facing to the east, and that the shades were up and he could see in the room from where he was sitting. That soon after the defendant and his wife drove up that he observed through the bedroom windows what he thought was scuffling. He stated that the defendant had on a red shirt and brown pants. He was asked: "Q. Did you recognize Pearl Igo? A. I couldn't exactly recognize her. It looked like she was not walking, but that he was dragging or pulling her along." He stated that at about 8 P.M. he noticed the defendant come to the double window and pull the shades down to about one foot of the bottom. On cross-examination he

denied seeing the defendant pick his wife up in play and kiss her.

Mary Ann Salmon, testified that she was 15 years of age, and acquainted with Yvonne Abbott and Dorothy Looney, and knew Pearl Igo in her lifetime, as well as her husband Jim Igo. That the Igoes lived right around the corner from where she lived. That the early evening of April 21, 1952, Yvonne Abbott came to her home around 7 o'clock. She stated that her father was taking G.I. training and his class commenced at 7 P.M., and he had just left when Yvonne arrived; and that she and Yvonne then left to walk to witness' grandmother's home on the way to Yvonne's home. They passed the Igo home on the south side about 7:15 P.M. and the front door was open. As they passed the southeast bedroom witness heard a loud commotion and heard a man's voice say, "Shut up" and then as they proceeded on west witness heard a woman scream loudly two times. She thought that there was a light in the kitchen.

The testimony of Mary Ann Salmon was corroborated by that of Yvonne Abbott. Yvonne additionally testified that she saw a green Chevrolet and a flat-bed truck parked at the Igo home at they walked by.

Wanta June Wardrobe, telephone operator at Coalgate, testified that the Igo telephone number was 555, and that somewhere around eight o'clock she got a ring from that number and a man's voice stated that he wanted "The Slaters" and she asked him if he wanted the funeral home or the residence, and he said just give him the Slaters. That she rang the funeral home and no one answered, and then she rang the residence and some one answered. That about twenty minutes later she got another call from 555 and a woman's voice asked her to get a doctor on the 'phone and she rang Dr. Clark's residence and some one answered. That later a female voice again called from 555 and asked her to get "the laws" and send them there. That she then got a fourth call from 555 and the voice of the man, who first called, wanted her to call a doctor, and that this

was about twenty minutes from the first call.

John Avanzini, brother of Pearl Igo, testified that some time after 8:00 P. M. on April 21, 1952 he received a call from Alexis Slater, the undertaker, and that he immediately went to the home of his sister, a block and a half away. That he drove his car and took his shot gun with him; that on arrival he left the gun in his car because defendant began hollering "get a doctor"; that he rushed in the house and found his sister in the southeast bedroom lying across a bed; that she was cold and dead and that there were blue marks around her throat. That he screamed at the defendant and asked him what had happened, but he did not tell him. He stated that in a minute his brother Joe Avanzini and wife Lottie arrived, and a little later Dr. John B. Clark arrived.

Dr. John B. Clark testified that he and his nurse, Thresa Cometti, arrived at the Igo home soon after 8:00 P. M.; that he found Pearl Igo lying across the bed in the southeast bedroom and her husband Jim Igo standing at the foot of the bed. That from his examination he determined that Mrs. Igo was dead, and apparently had been dead for about an hour; that he caused the officers to be notified, and that he demanded a coroner's jury; that there were bruises on both of deceased's shoulders in front from bottom up; and that her eyes were bruised, as well as her right cheek and there was a small bruise on the left cheek; that there were finger prints on her trachea or wind pipe. Witness stated that after the officers arrived the body was moved to a funeral home where an autopsy was conducted by himself and Doctors Northrip and Gillett; that they found her heart normal, her brain normal; they found no fracture of the skull, found her lungs normal, muscles of the heart normal and blood vessels normal; that they had an analysis of the stomach made and no poisoning was indicated. Witness testified that as a result of the autopsy all three of the doctors agreed that death was brought about by strangulation. He further stated that he had waited on Pearl Igo one time,

and that was either in January or February, and was for a bad cold or flu.

Dr. Ray U. Northrip of Ada, specializing in pathology, and who assisted in conducting the autopsy on the body of Pearl Igo, corroborated the testimony of Dr. Clark as to the bruises on the body of the deceased, and as to the sound condition of her heart, veins and other vital organs. The doctor stated: "I think death must have occurred quickly and probably due to the stoppage of the blood vessels to brain, shutting off the supply of blood to the brain and that death came very quickly. It is my opinion that she died from strangulation in that manner."

Dr. E. M. Gillett, physician specializing in surgery and connected with the Suggs Hospital and Clinic, Ada, testified and corroborated the conclusions stated by Dr. Clark based on the autopsy, that Pearl Igo came to her death by strangulation.

Emma Jewell Avanzini, wife of Dave Avanzini and sister-in-law of the deceased, testified that she was employed at the State Training School for Boys at Stringtown; that shortly after 8:00 P. M. on April 21, 1952, John Avanzini 'phoned and that she went alone to Pearl Igo's home some three blocks distant; there were a number of persons there, including Dr. Clark, his nurse, and the defendant. She was asked to describe what she saw in Pearl's bedroom, and answered: "Yes, I saw Pearl lying on the bed with her knees hanging off and she was blue to almost black in the face. And the room was not in absolute order, because she had been painting and things were disarranged some, And there were pillows on the floor. The headboard of the bed was to the east. There was just enough room on one side of the bed that a pillow had fallen off on that side * * *." She further stated that nothing was touched until the coroner's jury came, and one of the jurors picked up the pillow from the floor on the south side of the bed and called attention to blood being on it; that witness saw only dirt on the other pillow. Witness further testified: "The bed spread was fairly straight, as if it had been straightened. The sheet was

more or less regular beneath the spread." Witness further stated that there was some blood on a sheet. She said the shades on the east window were pulled down pretty low. She was asked about Pearl's hair, and stated: "Some matches were taken out of her hair, I took some of the matches. I picked them up—picked up matches between the spread and the blanket. Some of the matches looked as if they had been chewed on. There was some mud on the bed spread. I called attention to the mud."

H. E. Maxey, Assistant State Chemist, with the State Health Department, Oklahoma City, testified to examining certain spots on cloth sent him by Sheriff Bonner of Coalgate (and by other testimony shown to have been cut from the sheet and pillow case described by witness Emma Jewell Avanzini), and his test showed the spots positive, thus indicating they were blood spots. Further tests indicated human blood. He did not know whose blood or how the blood got on the objects in question.

Bill Anderson, agent for the Prudential Insurance Company of America testified to selling the deceased a one thousand dollar insurance policy in October, 1951; that Jim Igo was designated the beneficiary; that she had to pass a physical examination which was given her by Dr. Wallace Byrd of Coalgate. The policy was introduced into evidence. On cross-examination this witness stated that Mrs. Igo was 54 years of age, and for such reason a rigid physical examination was required. She passed the examination in good order.

The sheriff and a number of other witnesses testified for the State, mostly corroborating the testimony of other witnesses already related. There was received in evidence over the objection of the defendant certified copies of the court records in cases mentioned in the information where the defendant had previously been convicted of a number of felonies, which records were offered and received in support of the allegation that the present charge was a second offense charge.

The defendant offered the testimony of his sister, Mrs. Susan Schuyler, of Wichita, Kansas, to show that while the deceased and the defendant were in Wichita the deceased complained of something being wrong with her heart. Witness testified:

"Q. Will you please relate that discussion to the jury? A. Well, one time she came to my house and I lived upstairs and she came up and I met her, and she couldn't hardly breathe. She said, 'Oh its my heart'. I says, 'have you got heart trouble?' And she said, 'yes'. I said, 'Well will you lay down there on the bed and rest', and she said no she would be all right. She was breathing hard and we went on in, and if I remember correctly, she sat down and I gave her some water. She took a drink and said, 'Pretty soon I will feel all right.'"

She stated that Mrs. Igo told her about one other attack. She stated that her brother displayed love and affection for his wife.

Bob McInnis, druggist at Coalgate, testified to a girl clerk at a time in the past calling him to minister to Mrs. Igo who was in his drug store and who had apparently fainted. She was on the floor, and he thought that he aided her with spirits of ammonia and that in three or four minutes she was all right, and up and going. He did not remember ever having filled a prescription for her for a heart condition.

The defendant testified to his romance with Pearl, his war service, moving to Coalgate and denied as absolutely false the charge that he had ever struck, slapped or assaulted his wife Pearl. He stated that he loved his wife. He testified to and attempted to explain his previous convictions enumerated in the information. He testified to the deceased having in the past suffered what she thought were heart attacks. He denied having more than a friendly argument with Owen Summers at the Lakeside Tavern, Coalgate, on April 21, 1952. He admitted taking a few drinks that afternoon. He stated that his wife drove to the tavern. Defendant related his version as to what followed up to the time of his wife's death thereafter, as follows:

"A. She drove up and honked the horn, and I went out and she said,

'honey, get a couple of cokes and come and lets go home for supper.' I went back in and got the cokes and took them out and laid them in the seat by the side of her. She said, 'Come on, supper will be ready.' I said, 'I will be there in a few minutes.' She turned the car around and was gone. In a short while she came back and when she came back I passed her, going north. I had just pulled away from the Lakeside to go home. She came in behind me and we then both went on home.

"Q. Who got there first? A. I did. We have a circular driveway in front of the house. You can go into the driveway from either end. I pulled in on the circular driveway from the west and headed on in front of the house a little to the east side of the house I parked. Pearl turned in the driveway headed north on the west side of the house and parked her car. And I got out of the truck and walked over to the front and she got out of the car and came towards the house; and I held the door open for Pearl to go in the house, as I have done many times before. She went into the kitchen, which is the northwest kitchen. They call it the dining room I think. Then on the other side of the house— there are two kitchens—she had it rigged up as a duplex at one time. There are two kitchen cabinets and two sinks. She went to this cabinet and got a dish towel and turned around and started towards the stove. She said, 'You stink', and I said 'Yes'. And I said, 'Are you going to give me a kiss?', and I put my arms around her and kissed her and loved her. And I said, 'Is supper ready?' She says, 'It will be in a very few minutes.' I said, 'Honey, I believe I will run down and get me a drink while you are getting supper ready.' I said, 'Is the key in the car?' and she said, 'Yes', and she said, 'but don't stay long'. I said, 'I won't be gone very long', and I got in the car and drove back to my place of business, or our place of business

known as the old Phillips Lumber yard. I had a boy who was doing some cutting with a torch there, and this is pretty expensive equipment. He had been using the cutting torch and I stopped to see if he had put the torch away. I was there at the place of business for a while and later I got in the car and drove to the Lakeside Tavern and went inside and asked Ghigo if Ruffini had come back yet with any liquor. He was supposed to have gone after some more liquor. That was why he told me he didn't have any as well as I recall. He said, 'I have beer', and I said, 'I don't want the old stuff; I am drinking liquor and when I mix drinks it makes me drunk.' When I couldn't get a drink of whiskey there, I got in the car and started up to this log cabin, figuring I would go get another half pint and take it home. When I got there I got to looking for Owen Summers and I turned around and parked right north of the Palace Drug Store. It was raining, or just a kind of drizzle, and I sat there for a while. I was still in the car, and backed out and drove home. When I got home I got out and went in the house and the kitchen, the kitchen light of the northeast kitchen was the only light that was on in the house. The front door of the house was open. I walked on through the living room, and on into the kitchen and I didn't see her. I supposed she was in the bath room which I said before, was in about the middle of the house, and I hollered, 'Stinker, where are you at?' and she didn't answer and I hollered again and she didn't answer, and I knew if she were in the house she could hear me. And then I supposed she had stepped over to her mother's as she was over there nearly every day, and I supposed she had gone to see about those little tots whom she loved so much and so did I. We kept them at the house before this came up. Anyway, I went back in the living room and turned the light on by the side of the door and a big light hangs on the ceiling. I started

to sit down in a big easy chair there and I seen her lying on the bed in the southeast bed room with her feet hanging off as though she had sat down and laid back. I walked right in there where she was and didn't have any idea of anything being wrong with her in any respect. I walked in the bedroom. She was laying there and I crawled over the top of her to pet her and love her. I have laid on the bed with my wife lots of times, and done that, and I laid my head by the side of her neck and kissed her on the neck and sucked on the bottom of her ear as most women like for you to pet them and love them a little bit and she liked that. I loved Pearl and Pearl loved me, and I didn't have any idea * * * and I laid there and shook her and she didn't answer. She was limber. I rubbed the side of her face and shook her and she didn't say anything and I knew then there was something wrong. And then I jumped up and turned on the light. And when I turned the light on I saw her face was kinder blue and I ran to the telephone and rang the phone and asked for Slater. I supposed the Slaters had one of those pulmotors which most ambulances carry. I told him something had happened to Pearl, and he said, 'Did you call the doctor', and I said, 'I can right away'. And he said, 'You call the doctor', and I said 'I am going to right away.' I hung up, and as soon as I could get a line I called Dr. Clark and told him to hurry over as fast as he could as there was something wrong with Pearl. Then I went back to the bed to Pearl and got on the side of the bed and began to rub and shake her to try to bring her to, and I didn't get it done. Later on John Avanzini came in the house and when he came in he was not in a very pleasant mood, and I don't know why. And Joe Avanzini came in and he was not in a very pleasant mood, and I tell you for sure I was not feeling very good, and that is the truth, so help me God.!''

On rebuttal several brothers and sisters of the deceased testified that they had never heard of Pearl having had a heart attack. Some had heard of her having what they termed a little fainting spell at the drug store in Coalgate at one time. Dr. Wallace Byrd stated that he gave Pearl Igo a thorough physical examination on October 3, 1951 at the instance of the Prudential Insurance Company and found nothing wrong with her; that he examined her heart and found it normal.

Arthur Johnson testified that he rented a cabin to Pearl Igo several weeks prior to March 29, 1952 and testified to the defendant locking his wife out of the cabin and of Pearl complaining to him that the defendant had slapped and choked her; that about two weeks prior to her death she claimed defendant had locked her out until three o'clock in the morning.

There was much other rebuttal testimony not necessary to relate.

The defendant at the close of the evidence moved for a directed verdict, which was overruled, and the case was then argued and submitted to the jury; resulting in the verdict and judgment already stated.

For reversal it is first argued that the trial court erred in failing to grant defendant a continuance upon his motion therefor. The basis for this proposition is the allegation that the defendant was unable to employ counsel until the 15th and 19th of May, 1952, and as a consequence the attorneys did not have sufficient time to prepare for trial.

The record reflects, as already stated, that the crime charged was alleged to have been committed on April 21, 1952; the preliminary hearing was held on May 1, 1952. The defendant was represented by counsel who now represent him in the within appeal. Additional counsel, Sen. Geo. Miskovsky, acted as chief counsel at the trial, which was held on May 26, 1952. In a motion for a continuance of the preliminary hearing it was therein given as a ground that additional counsel had been employed, which was prior to May 1st. The record indicates that there was some

inaction by counsel by having to await fees. Nevertheless, the court considered that under the circumstances counsel had sufficient time to prepare for trial. See 22 O.S.1951 § 584. The State had no more time to prepare for trial than the defendant. It is argued in effect that the allegation of insufficient time of counsel in which to prepare the defense under the record, without more, entitled the defendant to a continuance. In overruling the motion, the court stated: "You do not set up in your affidavit for continuance any statutory ground for continuance. You do not claim you have subpoenaed any witnesses you are unable to secure the attendance of, and you have no showing whatever for a continuance."

 The record discloses that all the witnesses having any information bearing on the case lived in or closely around Coalgate. It would seem that counsel had ample time to investigate the case, consult and subpoena witnesses and prepare for the trial. The defendant was in jail, unable to make bond, and by the provisions of Art. 2 § 20, Oklahoma Constitution, was entitled to a speedy trial. The application for continuance was addressed to the sound discretion of the trial court, and a careful examination of the record discloses no circumstances that indicate that the court acted arbitrarily and not in the dispassionate exercise of the discretion contemplated by law. We therefore conclude that the court did not err in refusing to grant a continuance. See Porter v. State, 76 Okl.Cr. 16, 133 P.2d 903; Phillips v. State, 71 Okl. Cr. 287, 111 P.2d 203; Lemke v. State, 56 Okl.Cr. 1, 32 P.2d 331; Prescott v. State, 56 Okl.Cr. 259, 37 P.2d 830; Hall v. State, 11 Okl.Cr. 57, 142 P. 1044; Ex parte Cannis, 83 Okl.Cr. 113, 173 P.2d 586; Winegar v. State, 92 Okl.Cr. 139, 222 P.2d 170; Jones v. State, Okl.Cr., 236 P.2d 102.

It is next contended that the trial court committed error in allowing the introduction of evidence of prior convictions of the defendant. And while counsel recognizes that by the provisions of 21 O.S.1951 § 51, increased punishment is provided for persons who commit a crime subsequent to a previous conviction, it is urged that the habitual criminal statute should not have been invoked in this case because under the crime charged the punishment was either death or life imprisonment.

It is also argued that the defendant at all times denied striking, choking or molesting his wife, and informed the sheriff and others that he left his home to get a drink of whiskey while his wife was preparing supper and on his return around 8:00 P. M. or a little later the evening of her death, found her on her bed dead. It was his contention that she had previously had heart attacks, and he accounted for her death on such theory. It is asserted that the county attorney was bound to have possessed such information and to have been aware all along what defendant's defense would be, and that he was not justified under Johnson v. State, 79 Okl.Cr. 71, 151 P.2d 801, Broyles v. State, 83 Okl.Cr. 83, 173 P.2d 235 and other cases cited, in invoking the habitual criminal statute, and that when at the trial the State did introduce evidence of prior convictions of the defendant for other crimes, that this constituted fundamental error and entitles the defendant to a new trial.

 It is true that the defendant did testify and that his defense was in the nature of an alibi, and just as he advised the sheriff soon after the death of Pearl Igo. However, the accused did not testify at the preliminary and though he did make statements to the officials at the scene of the tragedy, flatly denying being present at the time of his wife's death or in any manner having caused her death, still such did not bind the accused as to the actual defense that he would interpose at trial, so the information correctly recited prior convictions as provided by 21 O.S.1951 § 51. Then on voir dire examination as part of his statement to the jurors in the box and in hearing of the panel present in the court room, one of the defense counsel stated:

"And the court will instruct you that these prior convictions may be used for a certain purpose, that is in connection with the penalty to be im-

posed should you find him guilty. And if the court instructs you that his prior convictions are not to be considered as evidence against him in this case, will you follow the court's instructions in that regard?" [The court reporter's note states that the jurors indicated that they would follow the court's instructions.]

Then at the commencement of the trial the defense did not make their opening statement, but waited to do that until the State had introduced its evidence. So that when the State commenced the introduction of its evidence its counsel well knew that one of its main witnesses, George Welty, who lived right across the street from defendant, would testify that a few minutes after 7:00 P. M. on the 21st day of April, 1952 he observed the defendant and his wife through a double window in the bedroom of their home, and he "thought they were scuffling", and that he would say that it looked like the defendant was pulling or dragging her along, that the defendant later pulled down the shades, etc. They knew that two other of their witnesses who passed defendant's home about this time would say that they heard a women scream several times, and one of such witnesses heard a man's voice say "Shut up". Also that Louis Ghigo, the tavern owner, would testify to an abrupt termination of a telephone conversation about 7:30 P. M., right about the time the proof indicated that Pearl Igo came to her death.

Under the circumstances recited, the prosecution was justified in assuming that the defendant might in a final effort at least admit a tussle with his wife, but plead that her injury was accidental and that they were only playing, or that both were possessed of high tempers and that he choked his wife in a heat of passion but without any design to effect her death.

Defendant's counsel states in his reply brief that on voir dire examination counsel for the State read the information to the prospective jurors, and counsel now says: "Defense counsel, knowing that the jurors were aware that the defendant had suffered prior convictions, or, at least knowing

that such knowledge was probable, could do little else than bring these prior convictions out and discuss them with the jurors on voir dire in an attempt to minimize their effect. To have followed any other course would have been foolish and unwise and would have, without doubt, caused even greater bias and prejudice against the defendant."

It would seem that under the circumstances of this case at the commencement of the selection of the jury only counsel for the defendant knew what defense was to be interposed. If counsel had determined at that time that he would have his client testify and would interpose an alibi, prior to the commencement of the selection of the jury such fact might have been imparted to the court out of the hearing of the jury and request made that the court order stricken from the information all reference to prior convictions, and thereafter all reference by the prosecution on voir dire or in making out its case, of such convictions. Having failed to reveal defendant's defense so as to be bound thereby, and the prosecution being in a dilemma as to what would be the defense strategy, it would appear that the prosecution was entitled to read the information, and thereafter was justified in making out its case in part by introducing evidence of such convictions, in accordance with the allegations of the information. The situation would have been materially different had counsel for the defense moved to strike such allegations from the information prior to the voir dire examination, giving as grounds the defense actually thereafter interposed. We think this conclusion is in accordance with the spirit of Johnson v. State, 79 Okl.Cr. 71, 151 P.2d 801, and Broyles v. State, 83 Okl.Cr. 83, 173 P.2d 235, and cases therein cited, all relied on by both the State and the defense in briefs filed herein. Should the court have overruled the motion of defense counsel, at the commencement of the trial, objection could have been repeated out of the hearing of the jury, and thus the record would have been perfected and even though defense counsel elected not to make an opening statement until the close of the State's ev-

idence, the State thus apprised of the defense, would have been precluded from introducing in evidence proof of former convictions, unless the State's own evidence would have compelled an instruction on some degree of the included crime of manslaughter. This element will be treated in detail presently.

But it must not be overlooked that irrespective of the allegations in the information of former convictions, when a defendant elects to testify in a case, upon testifying he becomes subject to the same rules of cross-examination and impeachment as other witnesses and may be questioned concerning prior convictions for the purpose of affecting his credibility. Booth v. State, 76 Okl.Cr. 410, 137 P.2d 602; Watts v. State, 76 Okl.Cr. 362, 137 P.2d 268; Murphy v. State, 72 Okl.Cr. 1, 112 P. 2d 438; Lane v. State, 91 Okl.Cr. 107, 216 P.2d 353. Under this latter situation the court would, of course, instruct the jury that such evidence was admitted for such limited purpose; that is, as affecting credibility, while in the first situation it would be admitted, as we have seen, and whether defendant would testify or not, as bearing on enhanced punishment.

It seems probable that counsel having from the beginning decided by reason of the nature of the defense to be interposed, on having the accused testify, well understood that there was no way to, under such circumstances, keep from the jury the information of the defendant's prior convictions, and hence made no effort to suppress this matter on voir dire, but on the contrary determined to weaken or obliterate the effect of such facts at inception. Nevertheless, all the State was entitled to do was introduce proper records of such convictions in making out its case, and nothing more. And that was all that was done until it came time to cross-examine the defendant after he had testified. It is urged that the special prosecutor went too far. This contention is not without some basis which brings up the question as to whether or not the error, if any, is sufficient to cause a reversal of this case.

The casemade discloses that when the defendant testified, although he denied having struggled with his wife, as sworn to by State's witness Welty, or being able to account for the screams from a woman and the voice of a man emanating from his home because at the time this happened he claimed to have been away from his home on a mission to obtain a drink of whiskey prior to the serving of dinner that his wife was preparing, nevertheless one of his attorneys not only by his examination had him admit the prior crimes set out in the information, but other convictions in addition, and attempted by his questioning to cause to be explained away one case where accused was convicted of the theft of an automobile. The excuse offered was that the taking was done in the heat of passion as a means of quick pursuit of an enemy who had wronged him, and that the asportation was only for that temporary purpose. So that the special prosecutor on cross-examination was permitted to go more or less into detail and delve into the factual situations opened up by defense counsel. The court permitted the prosecution possibly too much latitude, even though the procedure by defense counsel may have enticed the questioning by the prosecution. We say this for the reason that defendant stuck to his story of an alibi, although he attempted to explain away the finding of matches in his wife's hair and on her bed, similar to matches found in a pocket of the shirt he was wearing that evening, by saying that when he discovered her on the bed that he got on the bed, crawled over her and "kinder petted her" and then decided that something was wrong when she did not respond. But the trial court probably permitted such cross-examination as bearing on the credibility of the witness, and for such purpose only.

Also, on cross-examination of State's witness Welty, defense counsel attempted to have witness admit that defendant was only playing with his wife, and that witness saw him kiss her, which if he had so testified might have supported the theory of accidental death and required an instruction of manslaughter in the second degree. 21 O.S.1951 § 716.

We have often said that a conviction will not be reversed for erroneous rulings on evidence unless it appears that there has been a miscarriage of justice, or substantial violation of constitutional or statutory rights of defendant. 22 O.S. 1951 § 1068; Adams v. State, 49 Okl.Cr. 94, 292 P. 385; Wilcox v. State, 69 Okl. Cr. 1, 99 P.2d 531.

It further seems to be the general rule "That the extent of cross examination with respect to an appropriate subject of inquiry rests in the discretion of the trial court, and it is only in cases of clear abuse of such discretion, resulting in manifest prejudice to the complaining party, that a reviewing court will interfere." See 58 Am.Jur. p. 943, § 621; Barrow v. State, 17 Okl.Cr. 340, 118 P. 351, 9 A.L.R. 207. So that in view of the evidence as a whole, we do not deem the latitude permitted the prosecution on cross-examination sufficiently erroneous to constitute reversible error.

It is further contended that in view of the defense interposed that the court abused its discretion in giving an instruction on manslaughter in the first degree. Recognized is the rule stated by this court in Orrell v. State, 79 Okl.Cr. 300, 154 P.2d 779, 780, that "Where a defendant is charged with the crime of murder, it is the duty of the trial court to instruct on the law of manslaughter in the first or second degree, if there is any evidence that the alleged crime might have been committed under circumstances that would reduce the crime from murder to manslaughter." But it is contended that the evidence did not justify such an instruction. Cited by counsel is the case of Tucker v. State, 66 Okl.Cr. 335, 92 P.2d 595, 596, where the court refused to give an instruction on manslaughter in the second degree as not justified by the evidence. We approve the conclusion there reached, and a reading of the facts of that case will immediately by rememberance of the proof peculiar to this case and detailed above, distinguish the two cases. In paragraph two of the syllabus of the Tucker case, we also said:

"The trial court is thus vested with a discretion, which is subject to review upon appeal, but it will not be disturbed unless the record presents a clear case of abuse of discretion."

It is true that Mr. Welty was a witness for the State, as were the other witnesses whose testimony indicated a struggle between the defendant and his wife. Nevertheless it was apparently the opinion of the trial court that the jury in weighing the evidence might conclude that the defendant and his wife were having one of their family fights, shown by the record to have come about on other occasions, and that the choking, if done by the defendant, may have been done in the heat of passion and without any intention of actually inflicting death.

There was further evidence developed from a State witness that a telephone conversation between the deceased around 7:30 P. M. was suddenly and abruptly ended, the wife at the time warning the party Louis Ghigo, whom she phoned, not to sell her husband any more whiskey. Hence the instruction.

The general rule stated in 23 C.J.S., Criminal Law, § 1190, p. 731 and supported by many authorities, including State v. Quinlan, 84 Mont. 364, 275 P. 750; People v. Carson, 43 Cal.App.2d 40, 110 P.2d 98 and the involved principle, which we hereby approve, is that:

"As a general rule, it is the duty of the court, whether requested or not, to instruct on every essential question in the case so as properly to advise the jury of the issues; and the court should submit every question suggested by the evidence *whether offered by the prosecution or accused, or by both.*" (Emphasis supplied.)

In the early case of Cannon v. Territory, 1 Okl.Cr. 600, 99 P. 622, this court, in paragraph one of the syllabus, said:

"In a prosecution for murder, the court should submit the case to the jury for consideration upon every degree of homicide which the evidence in any reasonable view of it suggests; and, if the evidence tends to prove

different degrees, the law of each degree which the evidence tends to prove should be submitted to the jury, whether it be requested on the part of the defendant or not. It is the duty of the court to say, *as a matter of law*, if there is any evidence that would tend to reduce the degree of the offense to manslaughter in the second degree." (Emphasis supplied.)

This principle has been approved in a long line of cases, including Takarske v. State, 81 Okl.Cr. 189, 162 P.2d 197, cited by defense counsel, and in Cooper v. State, 61 Okl.Cr. 318, 67 P.2d 981, and Smith v. State, 59 Okl.Cr. 111, 56 P.2d 923, and cases cited.

It is noted from the record that defense counsel at trial requested the following instruction:

"No. 9. Ladies and Gentlemen of the jury, you are further instructed that the statutes of Oklahoma provide in part that:—

"Every killing of one human being by the act, procurement or culpable negligence of another, which is not murder, or manslaughter in the first degree, nor excusable or justifiable homicide, is manslaughter in the second degree.

"If you fail to find the defendant guilty of murder, or manslaughter in the first degree, you shall then consider whether or not he is guilty of manslaughter in the second degree; and if you find defendant guilty of manslaughter in the second degree, beyond a reasonable doubt, then you shall fix his punishment as measured by these instructions and so say by your verdict. If, however, you find him not guilty or entertain a reasonable doubt, you must acquit him."

The record does not show that counsel excepted to the instructions actually given by the court. Apparently at that time counsel was of the opinion that an instruction on manslaughter in the first degree was justified by the proof, and in truth by reason of it the jury might have assessed punishment as low as ten years confinement in the penitentiary, even though a second and subsequent offense, whereas without such instruction the punishment assessed could have been death.

From a consideration of the foregoing we conclude that the trial court did not abuse its discretion in giving an instruction on manslaughter in the first degree. In fact, the record impelled the giving of such an instruction.

The defense submitted in writing ten requested instructions. The court either gave verbatim or in modified form all the instructions requested by counsel, except the above concerning manslaughter in the second degree (where there was no evidence to support such an instruction), and a requested instruction on voluntary intoxication.

There was no evidence to show that the defendant was intoxicated when he drove to his home around seven o'clock on the evening of the tragedy. He did not so testify, nor did any witness for either the State or the defense contend that the defendant was intoxicated. The nearest justification for such a conclusion was where the evidence developed that in mid-afternoon the defendant was drinking with friends and became boisterous and argumentative. How much of the two half pints accused drank or his friends drank is not disclosed by the record, but the evidence does show that thereafter he ran out of liquor and was unsuccessful in his quest for it from then on. According to defendant's own testimony he drove to his home around seven o'clock, his wife began the preparation of the evening meal and everything was amiable. He merely suggested to his wife the thought that he would go get a drink prior to dinner, and so far as his testimony shows she did not protest, and he detailed his movements thereafter up to the time he claimed he found his wife lying dead on her bed. Defendant did not even intimate that the few drinks of whiskey that he consumed from around 3:30 until 7 P.M. had in any way affected him either physically or mentally. There was no contention of intoxication. Without some evidence to the con-

trary, and in view of his detailed history of his movements up to eight o'clock in the evening of the fatal day, which refuted a state of intoxication, we cannot assume that he was in fact intoxicated. It is at once apparent that such cases as Cheadle v. State, 11 Okl.Cr. 566, 149 P. 919, L.R.A.1915E, 1031; McCarter v. State, 14 Okl.Cr. 305, 170 P. 712; Tubby v. State, 15 Okl.Cr. 496, 178 P. 491; Choate v. State, 19 Okl.Cr. 169, 197 P. 1060, and Myers v. State, 83 Okl.Cr. 177, 174 P.2d 395, are inapplicable, and because the record did not justify the giving of the requested instruction on intoxication. That is our conclusion.

It is finally submitted "That the trial court erred in overruling defendant's objections to certain inflammatory and highly prejudicial statements made by prosecution and in allowing prosecution to make such statements throughout the trial."

■ The record discloses that the trial court did sustain certain objections interposed by defense counsel to a number of questions asked the defendant on cross-examination, deemed improper, and instructed the jury not to consider the same. As we have many times said, when a defendant elects to testify in his own defense, he is subject to cross-examination the same as any other witness. The manner of his examination is in a great degree within the discretion of the trial court. Any improper question will not always be cause for reversal of the case. The court may by sustaining an objection to the question, and instructing the jury to disregard the same, correct the error. Crouse v. State, 69 Okl. Cr. 24, 100 P.2d 467; Kennamer v. State, 59 Okl.Cr. 146, 57 P.2d 646.

Under the above assignment of error it is vigorously contended that the special prosecutor in his closing argument to the jury further advised the jury that it was his opinion that the defendant was guilty of the charge, which, coming from such source could be calculated to carry great weight, was improper and constituted reversible error. The cases of Hill v. State, 76 Okl.Cr. 371, 137 P.2d 261, and Rheuark v. State, 81 Okl.Cr. 60, 160 P.2d 413, are cited in support of the proposition. Of course if counsel made such unqualified statement there would be merit to the proposition. But the State in its answer brief denies the implications of the argument, as not justified by the record. We must, therefore, quote the statement as found in the record:

"I do not believe that, as jurors in this box, or men and women in the audience that any of you who have heard this testimony since it commenced has any idea that Pearl Igo died from a heart attack. And why do I say that, because no member of her family had any suspicion whatever that Pearl Igo had heart trouble. Pearl Igo was examined at the Suggs Clinic at Ada in 1945, as told to you by Dr. Gillett here yesterday, and her heart was normal. Pearl Igo was examined on October 3rd last year, here at Coalgate where she passed a physical examination for a life insurance policy. You heard Doctor Byrd of Coalgate testify to that. It is preposterous for any reasonable, honest, fair minded man to suspicion that Pearl Igo died from a heart failure. She didn't. She was murdered. [Note: Reporter's typographical marks indicate an interruption]

"Mr. Miskovsky: We object to the inflammatory statements of counsel and ask the court to admonish the jury to disregard the last statements.

"The Court: Overruled. Proceed.

"Mr. Miskovsky: Defendant excepts.

"I say according to this evidence, she was murdered."

Then further on in his closing argument, counsel for the State, after detailing certain evidence, stated:

"Murder has been committed in this case and we have proved it by as good citizens as ever lived in the country, and—

"Mr. Miskovsky: We object to those statements as being highly inflammatory, and no proper argument and we

request the court to admonish the jury not to consider it.

"The Court: Overruled.

"Mr. Miskovsky: We except."

From the statements as shown by the reporter it is clear that the State's counsel was interrupted by objections before he could conclude his statements, and that the conclusions followed detailed delineation of evidence and that such conclusions were justified by such evidence. We do not find room for misunderstanding.

This court has many times approved the principle that a prosecuting attorney may state his opinion as to the defendant's guilt when he also states that his opinion is based on the evidence in the case, and where the evidence detailed reasonably tends to support such conclusions. This does not mean, of course, that the prosecuting attorney may state facts not proven by the evidence or otherwise get before the jury that which amounts to his own testimony. Williams v. State, 4 Okl. Cr. 523, 114 P. 1114; Cline v. State, 57 Okl.Cr. 206, 47 P.2d 191.

Adverting to the premise with which we commenced the consideration of the record in this case, we find the evidence, though circumstantial, so conclusive of the guilt of the accused as to leave no reasonable doubt in the mind of one impartially studying the record, and the errors complained of not being of such a fundamental nature as to without more require a reversal, the case must be affirmed.

Therefore, the verdict of the jury and judgment of the district court of Coal County based thereon, is in all things affirmed.

JONES and BRETT, JJ., concur.

Supplemental Opinion on Rehearing

Following the promulgation by this court of its opinion in the within case January 20, 1954 counsel for the defendant not heretofore connected with the trial and subsequent appeal have sought a rehearing, and this court granted additional time, under the circumstances, for new counsel to study the record and file brief in support of their petition.

A number of errors are assigned, all of which, with the exception of one specification, previously received the attention of this court, and while not without merit, were not sufficient, in the judgment of this court, to cause a reversal of the verdict of the jury and judgment and sentence of the trial court.

The lengthy treatment of the issues, heretofore, did not seem to admit further detailing, and we find no justification for cumulative discussion.

The proposition now raised for the first time on rehearing, however, and being: "That fundamental error was committed by the trial court in allowing the introduction of State's exhibit 10, evidence of the conviction of plaintiff in error for drunk driving in the State of Kansas", merits attention.

The information, after charging the defendant with the crime of murder, a second and subsequent offense, and after detailing the manner in which defendant allegedly caused the death of his wife, further alleged:

"That heretofore and prior hereto the said Jim Igo, the defendant herein, was tried in the district court of Stanton County, Kansas in case No. 179, on the 21st day of June, 1933, at the regular February 1933 term of said Court, and entered his plea of guilty to the crime of "Grand Larceny", as charged in the information and defined by the General Statutes of the State of Kansas, and the said district court sentenced the said Jim Igo, to be confined in the Kansas State Penitentiary near Lansing, Kansas, for a term not exceeding five years, or until he is discharged from such institution by the Board of Administration, as provided by law, the Honorable F. O. Rindom being Judge of the District Court of Stanton County, Kansas, and said journal entry of judgment being filed with the Court Clerk of Stanton County, Kansas on January 21, 1933.

"That heretofore and prior hereto, the said Jim Igo, the defendant herein, was tried at Hutchinson, Kansas, in the district court of Reno County, Kansas in case No. 3460, on the 29th day, January, 1935, at the regular January term of said court, and entered his plea of guilty to the crime of 'Driving under the influence of intoxicating liquor', as charged in the information and as defined by Section 21–2160 of the General Statutes of the State of Kansas for 1935, and the said district court sentenced the said Jim Igo to be confined in the Kansas State Prison at Lansing, Kansas for a term of one to three years, concurrently or until discharged therefrom according to law, the Honorable J. G. Somers being Judge of the Ninth Judicial District of the State of Kansas, and said journal entry being filed with the Court Clerk of Reno County, Kansas on January 30, 1935."

Thus the basis for the prosecution under the habitual criminal statute was by reason of the alleged two previous convictions of the defendant of two separate felonies. This court has held that one or more convictions might be alleged and proven. And that the proof may be made by way of introduction of the record of the information, judgment and sentence showing prior conviction as alleged, notwithstanding the prior conviction or convictions have been admitted, and even though prior to trial a pardon may have issued as to prior conviction, the inquiry being, was there a conviction on a felony charge at a date prior to the charge for which the accused was being tried. Solomon v. State, 79 Okl.Cr. 93, 151 P.2d 944; Carr v. State, 91 Okl.Cr. 94, 216 P.2d 333, and Newton v. State, 56 Okl.Cr. 391, 40 P.2d 688; and cases cited. Also in the Carr case, supra, in the body of the opinion concerning the allegation in the information of more than one previous conviction, we said [91 Okl.Cr. 94, 216 P. 2d 340]:

"Further, by reason of the fact that one or more offenses might be charged, as heretofore held, proof of one addi-

tional offense would be sufficient, and the defendants do not complain of the manner of proof of every additional offense."

In Stroud v. State, Okl.Cr., 240 P.2d 1125, 1128, the defendant was charged with three previous convictions. The trial court was of the opinion that the proof was insufficient to show that the defendant was the person convicted in the previous cases, so struck from the consideration of the jury such alleged previous convictions. On appeal this court held that the trial court committed error in defendant's favor in excluding evidence of former convictions from the consideration of the jury where such trial court based its ruling on the fact that such evidence was circumstantial as to identity of the person being then tried, and this court further stated in the body of its opinion:

"* * * if the court's action in striking the evidence of the former convictions was correct, in the absence of any showing of bad faith on the part of the prosecution in introducing such evidence, the admonition given by the court to the jury to not consider such evidence for any purpose was sufficient."

So that in the within case we find no complaint as to the allegation in the information of the previous conviction of the defendant of the crime of "grand larceny", and the manner of proof made at the trial, but the complaint involves the second previous conviction alleged, and being, as heretofore stated, of the allegation that the defendant had "in the district court of Reno County, Kansas in case No. 3460, on the 28th day of June, 1935, entered his plea of guilty to the crime of 'driving under the influence of intoxicating liquor' as charged in the information."

The basis for the proposition now advanced that the court erred in admitting the evidence of defendant's plea of guilty to the crime charged in the Kansas court of "Driving under the influence of intoxicating liquor" is that though such a charge constituted a felony under the laws of the

State of Kansas at the time of defendant's entry of a plea of guilty, Section 21–2160 of the General Statutes of the State of Kansas for 1935, and although such constituted a felony in Oklahoma at the time, Section 10324 O.S.1931, and so continued until changed to a misdemeanor by Session Laws of 1941, p. 109, that our habitual criminal statute, Tit. 21 O.S.1951 §§ 51 and 54, should be construed to mean that the previous conviction of drunk driving, although a felony in Oklahoma at the time of conviction in Kansas, must have continued to be a felony in Oklahoma up to and through the trial for murder in Oklahoma, in order for such conviction to have been admissible in Oklahoma as a basis for prosecution under the habitual criminal act.

While the proposition advanced is interesting, so far as the within case is concerned, there are two reasons the above facts project, and which must have become apparent, why it comes too late. First, irrespective of a determination of the admissibility or inadmissibility of evidence to prove the second prior conviction alleged, and involving the drunk driving charge, evidence was introduced establishing a prior conviction of grand larceny, which was sufficient to support and to invoke the habitual criminal act. Tit. 21 O.S.1951 §§ 51, 54. Second, counsel for defendant announced ready for trial without raising objection to the information containing the charge of drunk driving; and on voir dire examination in questioning prospective jurors, after mentioning the previous convictions set out in the information, and stating the purpose as heretofore quoted in our previous opinion, stated to the prospective jurors:

"Q. Now about the State's charges of previous convictions. You wouldn't permit that to prejudice you against this man, in this case, would you where he had plead guilty two or three times before and served his time way back yonder when he was a young man? That automobile deal and that charge of driving while under the influence of intoxicating liquor and some other minor offenses. You wouldn't let that weigh with you and consider that as evidence against him in the case before you, would you? A. No, sir.

"Q. And you would only consider it for the purpose only which the court tells you in the charge it can be considered, and not beyond that?"

These questions were asked of each prospective juror in the substantial form as quoted.

When the State in making out its case offered proof of the two previous convictions, no objection was made as to Exhibit 10, proof of the drunk driving charge, on the basis that drunk driving was not a felony in Oklahoma at the time of the trial.

The fact is, when the defendant testified, his counsel went into the details of the two previous convictions and even brought out other convictions of misdemeanors never mentioned by the State in its case in chief.

We do not agree, as argued by the Attorney General, that counsel for defendant attempted to invite errors by failure to raise the proposition now argued, in the trial court, for the reason that original counsel never raised the same at any stage of the proceedings in the trial court or on motion for new trial, petition in error, or in brief on appeal, and different counsel now seeking a rehearing, could not have invited error when not previously connected with the case. However that may be, we have often held that errors occurring upon the trial of a case must be raised and urged before the trial court and passed upon by such court before the reviewing court will consider them upon appeal, unless the error assigned raises a jurisdictional question. Padgett v. State, Okl.Cr., 248 P.2d 1055; White v. State, 81 Okl.Cr. 399, 165 P.2d 151. Here, if the objection now urged had been interposed and the trial court had upheld the objection, the only effect would have been to strike it from the consideration of the jury, and thus leaving the grand larceny conviction to support the invocation of the habitual criminal act, and proof of which prior conviction, which was properly made, would have been sufficient.

And while by reason of the views expressed, to decide the point raised would constitute dicta, it might be pointed out that Sections 51 and 54, Title 21 O.S.1951 should be construed together. These provisions read:

"§ 51. Every person who, having been convicted of any offense punishable by imprisonment in the penitentiary, commits any crime after such conviction, is punishable therefor as follows:

"1. If the offense of which such person is subsequently convicted is such that upon a first conviction an offender would be punishable by imprisonment in the penitentiary for any term exceeding five years, such person is punishable by imprisonment in the penitentiary for a term not less than ten years. * * *"

"§ 54. When first conviction was foreign.—Every person who has been convicted in any other State, government or country of an offense which, if committed within this State, *would be punishable* by the laws of this State by imprisonment in the penitentiary, is punishable for any subsequent crime committed within this State, in the manner prescribed in the last three sections, [§§ 51–53] and to the same extent as if such first conviction had taken place in a court of this State."

The Attorney General contends that the italicized words of Section 54 "would be punishable" means would be punishable in this State as a felony at the time of the conviction in the sister state, and the inquiry is limited to that time in determining whether such conviction may be used at some later time as a basis for invocation of the habitual criminal act. If drunk driving had constituted a misdemeanor in Kansas at the time of the conviction there of the defendant, but later the crime had been made a felony in Kansas, no one would have contended that under such a situation such a conviction could be made the basis for the invocation of the habitual criminal act. Likewise, suppose drunk driving had constituted a misdemeanor in Oklahoma when such a charge actually constituted a felony in Kansas at the time of defendant's conviction there, but that prior to the present prosecution for murder the Oklahoma Legislature had caused drunk driving to be made a felony, would it be contended that the conviction of the accused in Kansas at a time such drunk driving in Oklahoma constituted a misdemeanor, could nevertheless by reason of the later act of the Legislature, be made the basis for invocation of the habitual criminal act?

If the conviction had been in Oklahoma at a time drunk driving was a misdemeanor clearly such conviction would not form the basis thereafter for invocation of Section 51 of the habitual criminal statute above quoted. Such would violate the ex post facto rule.

It would no doubt be agreed that as to the charge of homicide for which the defendant was tried, that he would be entitled to be dealt with under the laws as they existed at the time of the alleged commission of the homicide. So, likewise, would he not be entitled to be dealt with as to a previous conviction on the basis of the law governing such conviction at the time of the conviction in determining whether or not it could form the basis for the invocation of the habitual criminal act?

And while we are not called on to decide the issue now interposed for the reasons heretofore stated, we have indulged in testing its soundness, and we believe our reasoning is indicative of the fact that, even should the point have been raised in the trial court and the court have ruled adversely, such fact would not have caused a reversal of this case.

The mandate is ordered to issue forthwith.

JONES and BRETT, JJ., concur.