OPINION

Michael Ray JOLLY, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–17831.

Court of Criminal Appeals of Oklahoma.

March 27, 1973.

Don Anderson, Public Defender, Oklahoma County, for appellant.

Larry Derryberry, Atty. Gen., Fred H. Anderson, Asst. Atty. Gen., Kenneth L. Delashaw, Jr., Legal Intern, for appellee.

BUSSEY, Judge.

Appellant, Michael Ray Jolly, hereinafter referred to as defendant, was charged with Co-defendants Jerry Don Sharp and Teddy Eugene Herndon in the District Court of Oklahoma County, Case No. CRF–71–2684, with the offense of Murder. Severances were granted. Trial was had to a jury which found defendant guilty and fixed his punishment at life imprisonment. From said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, James Williams testified that he worked at Frontier City and at approximately 4:00 a. m. on October 15, 1971, he discovered that his car had been broken into. The wing window on the driver's side was smashed. He proceeded to find the night watchman, Jack Turner, to report the incident and discovered him in his car slumped down under the steering wheel. He woke up the park manager, Mr. Rinehart, and the two of them returned to Turner's car. They attempted to arouse Turner and, upon failing to do so, called the police. He subsequently discovered that some stereo tapes and a garage door opener were missing from his car. The garage door opener was discovered in a nearby trash can.

Leon Rinehart testified that on October 15, 1971 he was employed at Frontier City and that day he had hired Jack Turner as night watchman. He was awakened by Fletcher Williams at approximately 4:00 a. m. They proceeded to Jack Turner's car and he attempted to awaken him. He touched Turner's arm and it felt "cold and clammy". (Tr. 17) the time card showed that the last station check was made by Turner at 1:45 a. m. The southern portion of a fence around the Ghost Mine was broken.

Officer W. E. Martin of the Oklahoma City Police Department testified that he went to Frontier City in the early morning hours of October 16, 1971 and observed the dead body of Jack Turner in a car. He

went back to his patrol car and radioed headquarters for lab technicians.

Officer Tim Stinson, a lab technician with the police department, testified that he took a picture of the deceased at the morgue. He identified a plaster cast which he took from an impression in the ground inside the rear gate at Frontier City.

Officer Tom Bevel, an Oklahoma City Police Department lab technician, identified various pictures which he took at the scene. He identified State's Exhibit No. 27 as a spent projectile that he found in Turner's car.

Mrs. Jack Turner, the deceased's wife, testified that on the night of October 15, 1971, her husband was carrying a .38-caliber revolver and wore a gold watch. She identified State's Exhibit No. 28 as her husband's revolver.

Orville Burr testified that he was Jerry Don Sharp's employer and purchased State's Exhibit No. 25, a 30.06 rifle, approximately eight or nine years ago. In July or August of 1971 he sold the rifle to Sharp. He further testified that at his place of employment there were metal stencils for punching numbers onto metal.

Michelle Randleman testified that in October 1971 she lived in the same house as Jerry Don Sharp, Robert Purdue and Ted Herndon. Some time after October 16, she saw Jerry Don Sharp give the rifle, State's Exhibit No. 25, to Joe Yadon.

Joe Yadon testified that Jerry Don Sharp gave him the rifle, State's Exhibit No. 25, to keep for him. He fired the rifle at specific locations for ballistic purposes and anonymously called the police department and told them where to find the fired bullets. He went to Sharp's residence and observed a "warrant for murder" naming specificially the 30.06. He threw the rifle into a farm pond on South Western. When he returned home, the police were waiting and he subsequently showed the police officers the pond.

Frank Baugus, an Oklahoma City fireman, testified that he retrieved the rifle from a pond. The defendant stipulated that Baugus gave the rifle to Officer Don Rodgers.

Officer R. W. Smith testified that he observed State's Exhibit No. 28, Turner's pistol, in a search of the trunk of Jerry Don Sharp's car on November 9, 1971. Also found in the trunk was a spent 30.06 cartridge.

Officer B. J. Revels identified certain photographs he took of Jerry Don Sharp's vehicle showing the pistol and spent cartridge.

Defendant stipulated that State's Exhibit No. 30 was a pair of Herndon's shoes that matched the plaster cast taken at Frontier City.

Lieutenant Don Rodgers testified that he received the physical evidence from the various officers and transported it to the FBI for analysis on November 11, 1971. The defendant stipulated to the admission of the FBI report concerning the evidence. Rodgers testified that the serial number on State's Exhibit No. 28, Turner's pistol, had been altered with the number 61350. He further testified that Jerry Don Sharp's birthday was the sixth month, thirteenth day of 1950.

The defendant stipulated to the autopsy report of Dr. Jay Chapman which adduced that the deceased died of a gunshot wound to the back and neck.

Ted Eugene Herndon testified that he was jointly charged with the defendant with the murder. On the evening of October 15, 1971, he, the defendant, and Jerry Don Sharp met at "Kip's" and discussed burglarizing the Indian Trading Post at Frontier City. They parked by the Road House and walked to Frontier City. The defendant and Sharp squeezed through the fence and he climbed over. He identified the shoes he was wearing. Sharp had State's Exhibit No. 25, the 30.06 rifle, and he had a .38-caliber pistol of Sharp's. They also had a pry bar. They watched the night watchman check the buildings and then parked in front of the general office. Sharp asked "if we thought he

would shoot the guard." He replied, "I don't want no part of it." The defendant stated, "Sure, go ahead. He didn't think he would." Sharp kneeled down and Herndon testified that he heard a shot fired. The defendant reached down and picked up the gun hull. Herndon then broke and ran, running into the fence. He went down a short ways and then came back. The defendant and Sharp were over by the guard's car going through his property. The defendant was holding the rifle. Sharp told him to go over and check the "House of Gems to see if it had a burglar alarm." (Tr. 83) He checked the building for a burglar alarm and, upon returning, Sharp was inside the car going through the guard's pockets. Sharp removed his watch, pistol and money. Sharp gave the defendant Twenty Dollars ($20.00) of the guard's money. He and the defendant broke into another car and took some stereo tapes and a garage door opener. He threw the garage door opener into a barrel nearby. They then returned to Sharp's car and left.

On cross-examination, Herndon denied being promised anything by the State for testifying. He testified that the stereo tapes removed from the car at Frontier City were found in his house. He admitted that he and Jerry Don Sharp had been to Frontier City approximately a week earlier armed with the same weapons. He admitted giving two different statements to the police officers. He denied being at Hollie's Drive-In earlier that evening and drinking beer. He testified that he was afraid of Jerry Don Sharp.

The defendant testified in his own behalf that he was twenty-one years old and had been convicted of two prior felonies. He closed up the sandwich shop where he worked on the evening in question about 11:05 p. m. He, Jerry Don Sharp, Teddy Herndon and William Robbins went to his house where he changed clothes and then to Hollie's Drive-In where they drank beer. They took Robbins home about 1:00 a. m. and the remaining three went to the Road House, a dinner club next to Frontier City. Sharp got a fifth there and they all had some drinks. They discussed burglarizing the Indian Trading Post inside Frontier City. Sharp told him about a burglary they had committed a week before at Frontier City. The defendant told them that he did not think it would be wise to go back to a place that had been burglarized a week earlier. Sharp got a rifle and pistol from the car trunk, giving the pistol to Herndon and a crowbar to defendant, and the three started walking toward Frontier City. The defendant testified that he went along only because he was afraid of Sharp. Sharp had previously stated "that no one would turn State's on him and walk the streets." A car drove past and the three hid in the ditch at Sharp's direction. They proceeded on into Frontier City and watched the guard. Sharp aimed the rifle at the guard and asked if they thought he would pull the trigger. Defendant told Herndon he didn't think Sharp would shoot. Sharp remained crouched aiming at the guard for approximately fifteen minutes then fired. Sharp went over and took the guard's watch, pistol and keys. Herdon took the crowbar and broke out a wing vent in another car and burglarized it of stereo tapes. They left, stopping at Trucker's Inn for coffee, and then went to Sharp's house where defendant spent the night. Defendant denied receiving any money from Sharp.

William Robbins testified that he went to Hollie's Drive-In with Sharp, Herndon and the defendant on the evening in question. They drank beer at the drive-in and then went driving around. They took him home shortly before 1:00 a. m.

The sole proposition asserts that the court should have instructed on intoxication as affecting premeditation and intent. The question as to whether defendant was intoxicated or under the influence of a narcotic was conflicting. The defendant testified that he, Robbins, Sharp and Herndon had six beers at Hollie's Drive-In. At approximately 11:30 p. m., he took a mescaline pill. Sharp got a fifth of whiskey at the Road House and they had drinks.

The State's witness, Herndon, denied that he, the defendant, or Sharp had been drinking or took any type of pills or narcotics.

We are of the opinion that the trial court did not err in failing to instruct on intoxication as affecting premeditation or intent. On cross-examination, the defendant testified as follows:

"[By Mr. McKinney] Q. And what time was it now that you were drinking this whiskey?

"A. Approximately one-thirty.

"Q. Did you know what you were doing?

"A. I think I did.

"Q. Then you had control of your faculties there—

"A. Yes, sir.

"Q. And what was taking place?

"A. Yes, sir.

"Q. And you knew—at what point did the discussion start taking place about a burglary?

"A. After Jerry had come back with the bottle." (Tr. 130)

The defendant thereafter gave a detailed account of the events which transpired and repeatedly asserted that he had made it known to Sharp and Herndon that he did not want to be involved in the burglary. In Igo v. State, Okl.Cr., 267 P.2d 1082, we stated:

" * * * How much of the two half pints accused drank or his friends drank is not disclosed by the record, but the evidence does show that thereafter he ran out of liquor and was unsuccessful in his quest for it from then on. According to defendant's own testimony he drove to his home around seven o'clock, his wife began the preparation of the evening meal and everything was amiable. He merely suggested to his wife the thought that he would go get a drink prior to dinner, and so far as his testimony shows she did not protest, and he detailed his movements thereafter up to the time he claimed he found his wife lying dead on her bed. Defendant did not even intimate that the few drinks of whiskey that he consumed from around 3:30 until 7 P.M. had in any way affected him either physically or mentally. There was no contention of intoxication. *Without some evidence to the contrary, and in view of his detailed history of his movements up to eight o'clock in the evening of the fatal day, which refuted a state of intoxication, we cannot assume that he was in fact intoxicated. * * ***" (Emphasis added)

We further observe that the defendant did not object to the trial court's instructions nor did he submit any requested instructions. The record discloses the following dialogue between the trial court and counsel:

"BY THE COURT: We are now in chambers with the attorneys in this case, Mr. Hagle and Mr. McKinney, for the purpose of settling the Instructions. The State has furnished the Court two Requested Instructions, neither of which is being given exactly as stated; and Mr. McKinney, will you want these put in the record with the Clerk as Requested Instructions? You may want to reserve that until you see the Instructions as a whole

"BY MR. McKINNEY: No, sir, as a whole.

"BY THE COURT: Does the Defendant have any particular Requested Instructions?

"BY MR. HAGLE: No, sir.

"BY THE COURT: Alright, does the Defendant have any—contend that there is any particular theory of defense in this case other than the plea of not guilty which casts the burden on the State upon which an Instruction should be given?

"BY MR. HAGLE: No, sir.
* * *

"BY THE COURT: Does the Defendant have objections to these Instructions in whole or in part?

"BY MR. HAGLE: No, sir.

"BY THE COURT: Having thought it over, does the Defense have any Requested Instructions?

"BY MR. HAGLE: No, sir." (Tr. 178–180)

In Myers v. State, Okl.Cr., 480 P.2d 950, we stated:

"Had the jury believed the defendant's theory of the case, they would have determined it to be justifiable homicide and acquitted the defendant. In the case at bar, there were no elements of manslaughter, it was murder or nothing. Evidently defense counsel wanted it presented to the jury as it was, because they offered no objection to the instructions given nor did they offer any written instructions. This Court does not condone actions of defense counsel in 'laying behind a log', not objecting or offering any instructions and the raising it for the first time on appeal."

The judgment and sentence is, accordingly, AFFIRMED.

BLISS, P. J., and BRETT, J., concur.